UNION MUTUAL LIFE INSURANCE COMPANY, a Mutual Life Insurance Company organized under the laws of the State of Maine, and having its principal office in Portland, County of Cumberland, State of Maine, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 74–112–SD.

United States District Court, D. Maine, S. D.

Sept. 14, 1976.

---

Bruce A. Coggeshall, William C. Smith, James F. Keenan, Union Mut. Life Ins. Co., Portland, Maine, for plaintiff.

Peter Mills, U. S. Atty., Portland, Maine, Steven Z. Kaplan, Dept. of Justice, Tax Div., Washington, D. C., for defendant.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is a suit for refund of some $535,-946.24 federal income taxes and interest alleged to have been erroneously assessed to and collected from plaintiff for the calendar years 1958 through 1968. Plaintiff (the taxpayer) is a mutual life insurance company incorporated under the laws of the State of Maine and having its principal office at Portland. It is subject to taxation under Sections 801–820 of the Internal Revenue Code of 1954, as amended (the Code), 26 U.S.C. §§ 801–820 (1970), which sections were added to the Code by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112 (the 1959 Act).[1] It is stipulated that the taxpayer has complied with procedures governing exhaustion of its administrative remedies and that it has properly invoked the jurisdiction of this Court under 28 U.S.C. § 1346(a)(1970). By its amended complaint, the taxpayer has presented in six counts six distinct and separate challenges to determinations affecting the taxpayer's federal income tax liability made by the Commissioner of Internal Revenue. In addition, the United States has raised as a counterclaim a seventh issue as grounds for an offsetting adjustment against any recovery by the taxpayer. All seven issues presented arise under the 1959 Act.

---

1. Unless otherwise stated, references in this opinion to sections are to sections of the Code.

The action has been tried to the Court, without a jury, and has been fully briefed and argued by counsel. The following opinion contains the Court's findings of fact and conclusions of law as required by Fed.R. Civ.P. 52(a).

## INTRODUCTION: THE TAXING FORMULA

A description of the purposes and framework of the 1959 Act is needed at the outset to set the context of the issues presented by this action.

■ The purpose of the 1959 Act was to come to grips with certain difficulties inherent in the income taxation of life insurance companies. The two principal difficulties identified by Congress were (1) the need to determine what portion of a company's investment income is properly allocable to reserves which the company must hold for the purpose of meeting the company's future obligations to policyholders, and what portion is properly considered income taxable to the company and (2) the problem of calculating underwriting income on a yearly, as opposed to a long-term basis. *See* S.Rep. No. 291, 86th Cong., 1st Sess., 1959 U.S.Code & Ad.News 1577–82. The first step in Congress' approach to these difficulties was to decide that a life insurance company's taxable income would be calculated in three distinct parts or "phases." *Id.* at 1576. In Phase I the taxable portion of the company's investment income—its "taxable investment income"—is computed. Sections 804–806. In Phase II the company's gain (or loss) from operations—its "underwriting gain"—is computed. Sections 809–812. In Phase III the company's taxable income owing to certain distributions to stockholders is computed. Section 815.[2] Once each of these amounts has been computed, the company's taxable income is then computed under Section 802(b) to equal the sum of (1) the lesser of Phase I or Phase II income; (2) 50% of the excess, if any, of Phase II income over Phase I income; and (3) Phase III taxable

income, if any. The sum thus calculated—the company's "life insurance company taxable income"—is then taxed at the normal corporate rate. Sections 802(a), 11.

The issues presented in the instant case directly concern only Phase I of the overall computation, that is, the computation of the company's taxable investment income. The purpose of Phase I, simply stated, is to divide the company's investment income into two parts, that portion which is allocable to reserves held to meet the company's obligations to policyholders, which is not taxed; and that portion which is available to the company for other purposes, which is taxed. The Phase I computation proceeds as follows:

(1) For the taxable year in question, the company calculates its "gross investment income" by adding together interest, dividends, rents, royalties and other income derived from investments or any trade or business other than the insurance business. Section 804(b). From this amount the company deducts items allowed as deductions, such as investment and investment-related expenses. Section 804(c). The result is the company's "investment yield" for that taxable year. *Idem.*

(2) The company then calculates its "assets," Section 805(b)(4), as of the beginning and end of the taxable year and computes the mean thereof.

(3) The company then calculates its "current earnings rate" by dividing its investment yield by the mean of its assets. Section 805(b)(2). It also calculates its "average earnings rate" by computing the average of its current earnings rates for the present and last four taxable years. Section 805(b)(3). The lower of the current and the average earnings rates is the company's "adjusted reserves rate." Section 805(b)(1).

(4) The company then calculates its "adjusted life insurance reserves." Section 805(c). To do this:

2. Phase III is applicable only to joint stock life insurance companies, Section 815, and therefore not to the taxpayer in this action, which is a mutual life insurance company.

(a) The company first calculates the mean of its "life insurance reserves," as defined by Section 801(b), as of the beginning and end of the taxable year. Section 805(c)(1)(A).

(b) The company then calculates the weighted average of the interest rates which it has assumed for the purpose of calculating its life insurance reserves. Section 805(c)(2). This figure, which may be termed the company's "average rate of assumed interest," is then deducted from the adjusted reserves rate.

(c) The company then determines its "adjusted life insurance reserves" by reducing its life insurance reserves by 10% for each 1% by which the adjusted reserves rate exceeds the average rate of assumed interest. Section 805(c)(1).

(5) The company then multiplies its adjusted life insurance reserves by its adjusted reserves rate. The result, with certain adjustments not at issue here, is the company's "policy and other contract liability requirements" (policy liability requirements) for the taxable year. Section 805(a)(1).

(6) The company then divides its policy liability requirements by its investment yield. The result is the percentage of investment income which the company may allocate to reserves held for the purpose of meeting its obligations to policyholders. Section 804(a)(1). The remaining portion of the investment yield, less certain deductions not at issue here, represents the company's taxable investment income. Sections 802(b)(1), 804(a)(2).

This process is well illustrated by the following example drawn from the Senate Finance Committee's report on the 1959 Act, S.Rep. No. 291, *supra*, 1959 U.S.Code Cong. & Ad.News 1593–94:

Assume the following with respect to a life insurance company:

| | |
|---|---|
| Assets | $1,000,000 |
| Reserves | $900,000 |

| | |
|---|---|
| Investment yield (or net investment income before small business deduction under the House bill) | $40,000 |
| Company's current earnings rate ____ percent | 4 |
| Company's average earnings rate (for the current and 4 prior years) _____ percent | 3.75 |
| Company's assumed rate _____do_____ | 2.5 |

. . . [T]he average earnings rate of 3.75 percent would be used in determining the policy and other contract liability requirements. . . . [F]or every 1 percent of increase in the interest rate used, over the company's own assumed rate, the reserve is adjusted downward by 10 percent. Since here the 3.75 percent average earnings rate is 1.25 percentage points above the company's assumed rate of 2.5 percent, the reserve is adjusted downward by 12.5 percent. Thus, the $900,000 of reserves is reduced for purposes of this computation to $787,500. As a result, the reserve requirements in this case would be $787,500 multiplied by 3.75 percent or $29,531. . . . [T]his $29,531 is the policy . . . liability requirement. The next step is to express this requirement of $29,531 as a percentage of the $40,000 of investment yield. This is 73.8 percent of investment yield and, therefore, the life insurance company's share of the investment yield is 26.2 percent. That percentage of the investment yield (26.2 percent of $40,000) is $10,469. . . . [After subtraction of deductions allowed by Section 804(a),] the company's share of investment yield results in a phase 1 tax base of $6,364.

Each of the seven issues presented in this action by the six counts of the amended complaint and the counterclaim relates to one or more of the six steps of the Phase I computations:

1. Count I poses the question whether certain mortgage escrow accounts are "assets" of the taxpayer within the meaning of Section 805(b)(4). *See* Step (2).

2. Count II poses the question whether the taxpayer must include in its gross investment income "unearned interest" on

loans made against the cash surrender value of policies issued by it. *See* Section 804(b)(1)(A); Step (1).

3. Count III poses the question whether the taxpayer may deduct from gross investment income certain expenses incurred in the process of investigating possible real estate investment opportunities. *See* Section 804(c)(1); Step (1).

4. Counts IV through VI pose questions regarding whether the taxpayer may include certain items in its life insurance reserves. *See* Sections 801(b), 805(c); Step (4)(a).

5. The Government's counterclaim poses the question whether deferred and uncollected premiums on life insurance policies issued by the taxpayer are properly included in the assets and life insurance reserves of the taxpayer. *See* Sections 801(c), 805(b)(4), (c); Steps (2), (4)(a).[3]

## I. MORTGAGE ESCROW FUNDS (COUNT I)

### A. STATEMENT OF FACTS

During the years in issue the taxpayer invested substantial sums in mortgage loans. These loans were evidenced by notes and secured by mortgages on real property. By their terms the mortgage notes were payable in periodic installments, usually monthly, of principal and interest. In addition, most mortgagors, pursuant to the terms of the loan or mortgage documents, made monthly payments of amounts estimated to be necessary to pay real estate taxes and hazard insurance premiums on the mortgaged property. These additional payments are referred to as "mortgage escrow funds."

The taxpayer acquired its mortgage loan investments in either of two ways: by direct negotiation with the prospective borrower, or subsequent to negotiation of the mortgage loan by an independent mortgage firm, referred to as a "mortgage correspondent." In these latter instances, the mortgage correspondent offered the negotiated loan investment to the taxpayer either before or after the closing. If it accepted the offer, the taxpayer either provided the loan funds and closed the loan in its own name or purchased the loan subsequent to the closing, in which event the debt and mortgage were endorsed and assigned by the mortgage correspondent to the taxpayer. Under either arrangement it was customary that the mortgage correspondent thereafter had the responsibility for servicing the loan.

During the years in issue the taxpayer had agreements with a number of mortgage correspondents providing that the correspondent would service each loan produced by it. Under the terms of these agreements, the correspondents agreed to collect and remit to the taxpayer, after deducting the servicing fee, the payments of principal and interest received by the correspondents from the mortgagors. In addition, the correspondents agreed to collect the required payments from the mortgagors for the payment of real estate taxes and hazard insurance premiums and to pay these items as they became due. All such amounts were paid directly by the mortgagors to the mortgage correspondents, and none of these amounts was remitted to the taxpayer at any time.

The monthly payments made by the mortgagors representing the real estate taxes and hazard insurance premiums were deposited by the mortgage correspondents in local bank accounts upon which the correspondents would from time to time draw checks to pay, when due, the real estate taxes and hazard insurance premiums on the properties whose mortgages they were servicing. Typically, no interest on the funds held by the correspondents was paid to the mortgagors. No interest on these funds was paid to the taxpayer.

### B. DISCUSSION

The issue presented by Count I is whether these mortgage escrow funds are includ-

---

**3.** The counterclaim also presents the question whether the deferred and uncollected premiums should be included in the taxpayer's "gain from operations" in the Phase II stage of its tax computations. *See* Sections 802(b), 809; 26 CFR § 1.801–4(f).

ible in the "assets" of the taxpayer as defined by Section 805(b)(4).

On its tax return for each of the years 1958 through 1968, the taxpayer did not include these funds in assets. The Commissioner determined, however, that the taxpayer should have included these funds and recomputed the taxpayer's Phase I taxable income accordingly.[4] The taxpayer challenges this determination.

Section 805(b)(4) provides, in pertinent part:

> For purposes of this part, the term "assets" means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. . . .

The taxpayer does not rely on the Section's exclusion of property "used by it in carrying on an insurance trade or business." Rather, it contends that the escrow funds are simply not "assets of the company."

▇▇▇ For the purpose of determining whether mortgage escrow funds are "assets of the company" within the meaning of Section 805(b)(4), the Court is persuaded that the proper test is that adopted by the Court of Appeals for the Fifth Circuit in *Liberty National Life Insurance Co. v. United States,* 463 F.2d 1027 (5th Cir. 1972). There, the court ruled that such assets included, *id.* at 1030,

> only . . . those assets of a life insurance company which are available to be, even though not actually, invested.

This interpretation has been endorsed by the Tax Court. *Bankers Union Life Insurance Co. v. Commissioner,* 62 T.C. 661, 676–77 (1974). It is plainly in accord with the scheme of the 1959 Act: the purpose of calculating a company's assets is to determine accurately its rate of return on its investment assets, Section 805(b); if funds not available for investment were included in assets, the result would be a distortion of the company's rate of return.[5] In addition, the interpretation adopted in *Liberty National* is in accord with the ordinary meaning of the term "assets";[6] and absent a legislative direction to the contrary or a danger that the purpose of a statute will be undermined, neither of which is present here,[7] ordinary meaning will govern. *Malat*

---

4. For each year and the four years preceding each year, the Commissioner determined that the assets of the taxpayer should be increased by the mean amounts of the mortgage escrow funds held by the taxpayer's mortgage correspondents. The effect of this increase in assets was to reduce the taxpayer's adjusted reserves rate. Section 805(b); Step (3). Under the procedures for determining taxpayer's Phase I taxable income, the reduction in taxpayer's adjusted reserves rate had the effect of reducing the difference between this rate and taxpayer's average rate of assumed interest. Section 805(c)(2); Step (4)(b). The reduction of this differential had the effect of increasing taxpayer's adjusted life insurance reserves. Section 805(c)(1); Step (4)(c). The figures involved were such that the combined effect of reducing taxpayer's adjusted earnings rate and increasing its adjusted life insurance reserves was to reduce taxpayer's policy liability requirements, Section 805(a)(1); Step (5), and thereby increase its taxable investment income. Sections 802(b)(1), 804(a); Step (6).

5. Special considerations may apply, however, with respect to whether items other than mortgage escrow funds must be deemed "assets" within the meaning of Section 805(b)(4). Thus, where sums such as uncollected and deferred premiums are included in a company's life in-

surance reserves under Section 801(b) but are not available for investment by the company, the failure to include these sums in assets would produce a distortion of the company's reserve requirements. Therefore, an exception to the general rule would have to be made, as indeed the court recognized in *Liberty National, supra,* at 1031–32. *See also Southwestern Life Insurance Co. v. United States,* 75–1 U.S.T.C. ¶ 9321, at 86, 746–48 (N.D.Tex. 1975).

6. Thus, Webster's Third New International Dictionary, Unabridged 131 (1971) defines "assets" as

> the entire property of all sorts . . . of a person, association, corporation or estate applicable or subject to the payment of his or its debts.

*See also* Black's Law Dictionary 151 (4th ed. 1951); 1 Bouvier's Law Dictionary 259 (3d rev. ed. 1914).

7. The Government has attempted without success to find evidence in the statute that Congress intended "assets" to include all property within the control of a company or from which the company derives some benefit. The two grounds on which the Government presses this view are inapropos. First, the use in the 1959 Act of the term "assets" rather than the term

*v. Riddell*, 383 U.S. 569, 571–72, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Crane v. Commissioner of Internal Revenue*, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).

Whether by application of the *Liberty National* rule or otherwise, every other court to consider the question has also held that mortgage escrow funds are not assets of a life insurance company within the meaning of Section 805(b)(4). *Bankers Life Co. v. United States*, 412 F.Supp. 62, 71–73 (S.D.Iowa 1976); *Southwestern Life Insurance Co. v. United States*, 75–1 U.S.T.C. ¶ 9321 (N.D.Tex.1975); *Ohio National Life Insurance Co. v. United States*, 75–1 U.S.T.C. ¶ 9125 (S.D.Ohio 1974); *Franklin Life Insurance Co. v. United States*, 67–2 U.S.T.C. ¶ 9515 (S.D.Ill.1967), *rev'd on other issues*, 399 F.2d 757 (7th Cir. 1968), *cert. denied*, 393 U.S. 1118, 89 S.Ct. 989, 22 L.Ed.2d 122 (1969); *Jefferson Standard Life Insurance Co. v. United States*, 272 F.Supp. 97, 125 (M.D.N.C.1967), *aff'd, rev'd and remanded on other issues*, 408 F.2d 842 (4th Cir.), *cert. denied*, 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969); *National Life Insurance Co. v. United States*, 521 F.2d 1406 (Ct.Cl.1975); *Bankers Union Life Insurance Co. v. Commissioner, supra.*

 The Government disagrees with the conclusion reached in the above cases. It argues that the mortgage escrow funds were within the control of the taxpayer and hence available for investment by it because, pursuant to the mortgage agreements with the mortgagors, the taxpayer, as mortgagee, was entitled to receive the escrow funds directly from the mortgagors. The record does not contain a typical mortgage agreement executed by or assigned to the taxpayer. The record does suggest that the taxpayer acknowledges that it had the right, as mortgagee, to receive the payments in question itself and was not obligated by the express terms of the mortgage agreements to hold these payments in trust for the mortgagors or to pay interest thereon to the mortgagors. The evidence clearly establishes, however, that the taxpayer nonetheless recognized an obligation to use these funds solely for the purpose of paying the mortgagor's property taxes and hazard insurance premiums. To this end, the taxpayer contracted with the mortgage correspondents to have the correspondents retain these funds "in trust, as trustee for the . . . mortgagor" and use them to make these payments as they fell due.[8] The taxpayer received no interest from these funds, and the uncontroverted testimony was that this arrangement with its mortgage correspondents in no way reduced the servicing fees which the taxpayer paid the correspondents.[9]

"invested assets" used in the prior law, Internal Revenue Code of 1954, Section 803(g)(2), hardly evidences an intent to include assets *unavailable* for investment. Second, the reference in Section 805(b)(4) to "nonadmitted assets" is a clear reference to items as classified by state insurance laws. Under these laws "nonadmitted assets" include, typically, those whose "value is enshrouded with doubt" or which are not eligible to satisfy state reserve requirements; they may also include deductions necessary to bring the company's valuation of certain investments into line with rules of valuation prescribed by state law. Wightman, Life Insurance Statements and Accounts 60–62 (1952). The use of the term "nonadmitted assets," then, in no way indicates an intent to include items not available for investment.

8. The standard servicing agreement executed by the taxpayer and its mortgage correspondents provided that the correspondent

will . . . hold in trust, as trustee for the [taxpayer] or mortgagor, as the case may be, and will deposit in a bank or banks approved by the [taxpayer] all other monies . . . received by it upon any mortgage loan assigned to the [taxpayer], until applied in accordance with the terms of the note or mortgage securing the same.

Neil C. Gould, taxpayer's Second Vice President in Mortgages and Investment Real Estate, testified without contravention that the phrase "all other monies" included the tax and insurance payments made by the mortgagor to the correspondent which constituted the mortgage escrow funds involved in this case and, again without contravention, that with respect to these funds the phrase "in trust, as trustee for the [taxpayer], or mortgagor, as the case may be" dictated a trust for the benefit of the mortgagor, not the taxpayer.

9. The record is silent on whether these funds were deposited in interest-bearing accounts, although it does make clear that neither the mortgagors nor the taxpayer received any such interest.

The Government also argues that the taxpayer received an investment benefit from the mortgage escrow funds in that they helped make its loans more secure. But any such beneficial effect is merely incidental to the fact that the funds are paid and held to meet obligations of the mortgagors and cannot afford any basis for a finding that they were available for investment by the taxpayer. *Bankers Union Life Insurance Co. v. Commissioner, supra,* at 677. The evidence further establishes that the funds did not in any way have the effect of freeing other assets of the taxpayer not otherwise available for such purposes. *See Liberty National Life Insurance Co. v. United States, supra,* at 1031; *Bankers Union Life Insurance Co. v. Commissioner, supra,* at 677.

The record in the present case clearly establishes that the mortgage escrow funds here under consideration were held in trust by the mortgage correspondents for the purpose of paying obligations of the mortgagors, that they were never held or available for investment by the taxpayer, and that they in fact belonged to the mortgagors and not to the taxpayer.

The Court holds that the mortgage escrow funds held by the taxpayer's mortgage correspondents do not constitute "assets" of the taxpayer within the meaning of Section 805(b)(4).

## II. UNEARNED POLICY LOAN INTEREST (COUNT II)

### A. STATEMENT OF FACTS

Life insurance policies issued by the taxpayer which have cash surrender values provide that a loan may be obtained on the sole security of the policy at any time when a cash value is available and the policy is in force. Such loans are termed "policy loans." The most common type of policy loan made by the taxpayer is the automatic premium loan, by which the premium is paid by borrowing against the cash surrender value of the policy. In addition, the policyholder may borrow against the cash surrender value for any other purpose he may choose.

At the time a policy loan is made, the taxpayer charges the policyholder interest in advance for the period from that date to the next policy anniversary date. Thereafter, on each succeeding anniversary date, the taxpayer charges the policyholder one year's interest in advance. For example, if a loan secured by a policy with an April 1 anniversary date is made on January 1, the policyholder is charged interest from January 1 through March 31. On each succeeding April 1 that any portion of the loan remains outstanding, the taxpayer charges the policyholder interest in advance for the ensuing policy year on the outstanding amount.

When these interest charges are made, the taxpayer bills the policyholder for the interest. If the policyholder does not pay the advance interest in cash, the taxpayer makes a book entry, adding the advance interest charge to the loan balance through a method known as a loan discount.[10] The taxpayer continues to add the interest to the loan balance on policy anniversary dates so long as the loan balance does not exceed the cash surrender value of the policy. With respect to automatic premium loans, the advance interest charge is never in cash and is always represented by a book entry. With respect to other types of loans, the first interest payment is in most cases a

---

**10.** The loan discount method operates as follows:

Assume the policy anniversary date is January 31, the policyholder wants to borrow $1,000, and the loan is made on January 31, 1976 on the basis of interest in advance at the rate of 4.8% per year (yielding an effective rate of 5.042%).

On January 31, 1976 when the loan is made, the taxpayer pays the policyholder $1,000 and makes an entry on its books representing an interest charge for the ensuing policy year in the amount of $50.42. If the balance of the loan is $1,050.42 on January 31, 1977, the succeeding policy anniversary date, the taxpayer will once again charge the policyholder interest in advance for the ensuing policy year at the rate of 4.8% on the $1,050.42.

book entry. Thereafter, the annual interest charges are approximately evenly divided between cash payments and book entries.

The policyholder has the right to repay a loan at any time, and, if he does so, the taxpayer calculates the exact number of days the loan has been outstanding and retains or collects from the policyholder only the interest for that many days. The "unearned interest," that portion attributable to the remaining period of the policy year,[11] whether paid in cash or entered on the taxpayer's books, is refunded or credited to the insured, as the case may be. If the policyholder surrenders his policy for its cash value, the taxpayer similarly calculates the amount of interest attributable to the time prior to the date of surrender and refunds or rebates the remaining interest. If the policyholder dies, the principal amount of the loan plus the exact amount of interest attributable to the time prior to the date of death are deducted from the death benefit and the remaining interest is refunded or abated. The abatement or refunding of unearned interest in the event of repayment, surrender of the policy or death of the insured is required by the terms of the contract of loan.

The parties have stipulated that the amount of unearned interest at the end of the calendar year which will actually become earned by the taxpayer in the following year is not determinable at that time with respect to any particular policy loan, as it is dependent upon whether the policyholder continues to live and whether he elects to repay the loan or surrender the policy for its cash value.[12]

For any loan which has not been earlier repaid, the taxpayer on December 31 of each year determines the amount of unearned interest, that is, the amount of interest previously paid or entered on its books which the taxpayer will earn between December 31 and the next anniversary date of the underlying policy.

In the annual statement forms filed by the taxpayer with state supervisory officials for each of the years involved, unearned interest was excluded from gross investment income. The parties have stipulated that this treatment of unearned interest is consistent with the requirements of the annual statement prescribed by the National Association of Insurance Commissioners (N.A.I.C.) and required by Maine law, and is in accord with generally accepted accounting principles.

## B. DISCUSSION

The question presented is whether Section 804(b)(1)(A) requires the taxpayer to report as gross investment income cash payments and book entry payments of policy loan interest which has not yet been earned as of the close of the taxable year.

On its tax returns for each of the taxable years 1958 through 1968, the taxpayer computed its gross investment income from policy loans under the same method as used on its N.A.I.C. annual statement, and did not include its unearned policy loan interest.[13] For each year the Commissioner determined that the taxpayer's unearned interest on policy loans should have been included in gross investment income under Section 804(b)(1)(A) and accordingly increased the

---

11. For the purposes of this case, the term "unearned interest" means the amount of interest which at any particular point in time has been either entered on the taxpayer's books as a loan discount or actually received by the taxpayer as a cash payment, and which represents compensation which is computed to be for use of the money loaned for periods extending beyond that particular point in time; and the term "earned interest" means the amount of interest which represents compensation which is computed to be for use of the money prior to that particular point in time.

12. With respect to each of the years involved, a certain portion of the unearned interest on policy loans was refunded or abated by reason of the repayment of the loan, surrender of the policy or death prior to the next policy anniversary date. The average amount of interest so refunded or abated for each of the years involved was 13.3% of the "unearned interest" reflected at year end on the taxpayer's annual statements.

13. The taxpayer files both its N.A.I.C. annual statements and its federal income tax returns on a calendar year basis.

taxpayer's gross investment income for each of the years in question. The taxpayer contests that determination.

Section 804(b)(1)(A) defines a life insurance company's "gross investment income" to include the gross amount of any interest income. The interest which the taxpayer earns on policy loans is concededly gross investment income within the meaning of the statute. The present dispute between the parties is a matter of timing, an instance of "the protracted problem of the time certain items are to be recognized as income for [tax] purposes." *Schlude v. Commissioner of Internal Revenue*, 372 U.S. 128, 129, 83 S.Ct. 601, 602, 9 L.Ed.2d 633 (1962). Resolution of this dispute is governed by the accounting provisions of the Code, particularly Section 818(a). *See also* Sections 446, 451.

The taxpayer is required under Section 818(a) to report its income under the accrual method of accounting. Section 818(a) provides:

*Method of accounting.*—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary or his delegate, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

The accrual method of accounting referred to in Section 818(a) is defined in Treasury Regulation (26 CFR) 1.446–1(c)(1)(ii) (emphasis supplied):

*Accrual method.* Generally, under an accrual method, income is to be included for the taxable year *when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.*

. . .

The taxpayer contends that in reporting only the "earned interest" on policy loans, it was following the accrual method of accounting, as well as adhering to the accounting method required by the N.A.I.C. The taxpayer notes that interest is "compensation for the use or forebearance of money," *Deputy v. du Pont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1939), and is necessarily earned only with the passage of time. Inasmuch as a portion of the full interest charged in advance to a policyholder will have to be repaid or returned to the policyholder's account on the happening of any of several contingencies, the taxpayer argues, the right to receive such income cannot be regarded as "fixed" until earned.

The Government contends that under its contracts with policyholders the taxpayer's right to receive interest for the full period until the next policy anniversary date was indeed "fixed" at the date charged (albeit unearned and subject to partial repayment or reduction on the occurrence of a contingency). The accrual method of accounting, in the Government's view, thus required that the unearned interest be included in the taxpayer's gross investment income for the year in which it was charged.[14]

The Court agrees with the Government that at the time a policy loan is made the taxpayer acquires a "fixed right to receive" interest in advance and therefore the in-

---

**14.** Alternatively, the Government argues that even if the taxpayer has properly excluded "unearned interest" pursuant to Section 818(a), the Commissioner was nonetheless justified in requiring its inclusion under Section 446(b), which provides that

if the method [of accounting] used [by the taxpayer] does not clearly reflect income, the

computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

Since the Court accepts the Government's Section 818(a) contention, it is unnecessary to reach its Section 446(b) argument.

come has accrued within the meaning of Section 818(a) and Regulation 1.466–1(c)(1)(ii). The policy loan provisions of the life insurance policies issued by the taxpayer provide for policy loans on the following terms:

> Loan interest shall be calculated at 5.65% a year, in advance, or at such lower rate as the Company shall determine, and shall be payable on each policy anniversary. Any interest not paid when due shall be added to the loan and bear interest at the same rate.

Thus, under the terms of its loan contracts with its policyholders, the taxpayer's right to receive the interest payments is fixed at the time the loan is made and on each subsequent policy anniversary date. The parties have stipulated that the taxpayer in fact bills policy loan borrowers for interest in advance covering the full period of the loan until the next policy anniversary date. If this bill is not paid, the taxpayer makes an entry in its books signifying that the interest is due and payable (albeit "unearned") and deductible from the cash surrender value of the underlying policy. Furthermore, the loan contracts place no restriction on the taxpayer's use of any interest payments received in advance and do not appear to provide expressly for abatement or repayment of interest in the event that the policyholder repays the loan prior to the next anniversary date.

Two Courts of Appeals have held that where, as here, the full interest on a policy loan is due and payable in advance, and an accrual-basis taxpayer receives it free of any trust or other restriction on its use, the taxpayer's right to receive it must be regarded as "fixed" and therefore as accrued within the meaning of Regulation 1.446–1(c)(1)(ii). *Jefferson Standard Life Insurance Co. v. United States, supra,* 408 F.2d at 856–57; *Franklin Life Insurance Co. v. Commissioner, supra,* 399 F.2d at 761–63.[15]

This conclusion is consistent with the general rule of accrual accounting that the right to receive an item of income must be regarded as fixed when due and payable to the taxpayer. *See Schlude v. Commissioner of Internal Revenue, supra,* 372 U.S. at 136–37, 83 S.Ct. 601 (payment for dance studio lessons); *Spring City Foundry Co. v. Commissioner of Internal Revenue,* 292 U.S. 182, 184–85, 54 S.Ct. 644, 78 L.Ed. 1200 (1934) (accounts receivable arising from sales); *Brown v. Helvering,* 291 U.S. 193, 198–99, 54 S.Ct. 356, 78 L.Ed. 725 (1934) (commissions from prepaid insurance premiums). *See also American Automobile Association v. United States,* 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) (prepaid annual membership dues). In each of these cases, the Supreme Court held that the income in question was fully taxable in the year of receipt, despite the fact that a portion of the income represented payment for services to be performed in a subsequent year.

The authorities advanced by the taxpayer are inapposite. Each concerned the proper method of reporting finance charges on installment sales of automobiles or other equipment. *Luhring Motor Co. v. Commissioner,* 42 T.C. 732 (1964); *Gunderson Bros. Engineering Corp. v. Commissioner,* 42 T.C. 419 (1964); *Smith Motors, Inc. v. United States,* 61–2 U.S.T.C. ¶ 9627 (D.Vt.1961). In each of these cases an accrual-basis taxpayer entered into an installment sales contract providing for a down payment plus future monthly payments comprised of principal plus a finance charge (interest plus a servicing fee); and in each case the court held that the taxpayer could properly report the finance charges as income only as each monthly charge fell due. The basis of this holding was stated by the court in *Luhring,* 42 T.C. at 743:

> As in the case of interest, petitioner's right to receive the collection on handling

**15.** *But see Bankers Union Life Insurance Co. v. Commissioner, supra,* 62 T.C. at 679–82. There, the court rejected the Commissioner's determination that a life insurance company was required to report unearned interest on policy loans which was not prepaid in cash by

the policyholder. In so holding, the Tax Court relied on *Luhring* and *Gunderson Bros., infra.* But the rationale of these cases does not apply where, as in the instant case, policy loan interest is payable in advance. *See infra.*

charges only became fixed and the amount determinable with reasonable accuracy upon the passage of time and servicing of the customers' outstanding debts by the petitioner; and such right matured only at the time each installment was due and payable. *Spring City Foundry Co. v. Commissioner [of Internal Revenue] [supra].* These decisions do not apply where, as here, the governing contract provides that interest is "due and payable in advance." [16]

█ Nor does the fact that the taxpayer is obligated to refund or abate a portion of the advance interest if the policyholder preterminates the loan in some manner change the result. The parties have stipulated that the taxpayer in fact refunded or abated less than one-seventh of its "unearned" interest. There is no reason to believe that this rate of refunding or abatement is any greater than the chances of other contingencies, such as the general risk of uncollectibility, which the courts have found insufficient to justify deferral of income due and payable. *E. g., Spring City Foundry Co. v. Commissioner of Internal Revenue, supra.* The Court agrees with the Government that the possibility that a portion of the interest will have to be repaid or credited to the policyholder in a subsequent year does not remove advance interest from the category of income which the taxpayer

has a "fixed right to receive." *See Brown v. Helvering, supra,* 291 U.S. at 199, 54 S.Ct. 356; *Jefferson Standard Life Insurance Co. v. United States, supra,* at 856–57; *Franklin Life Insurance Co. v. United States, supra,* at 762–63; *Fowler v. Commissioner, supra* note 16, at 179–80.

` The Court holds that Section 804(b)(1)(A) requires the taxpayer to include in gross investment income interest on policy loans charged in advance but not yet earned.

## III. INVESTMENT EXPENSES (COUNT III)

### A. STATEMENT OF FACTS

The taxpayer regularly invests substantial sums of money in real estate, both through loans secured by real estate mortgages and by direct ownership of real estate.[17] As a part of its real estate investment business, the taxpayer constantly watches for investment opportunities, and regularly reviews a variety of opportunities. The vast majority of opportunities which the taxpayer reviews never materialize.[18] Two such aborted opportunities are at issue here:

(1) In 1967 the taxpayer became interested in a proposed real estate development in Newton, Massachusetts. The taxpayer decided to invest in the project, but only if the necessary rezoning could be obtain-

---

16. The courts have appeared to recognize this limit to the principle of *Luhring* in decisions holding that where the seller on an installment sales contract sells his interest to a finance company, the seller must at that time report the entire balance due, including interest and servicing fees payable only at a later date. *See Commissioner of Internal Revenue v. Hansen,* 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959); *Federated Department Stores, Inc. v. Commissioner,* 51 T.C. 500, 505 (1968), aff'd, 426 F.2d 417 (6th Cir. 1970). The basis for this distinction was set forth in *Fowler v. Commissioner,* 26 T.C.Mem. 175, 179 (1967):

> [*Gunderson Bros.* and *Luhring*] involve accrual basis dealers who retain their customers' paper. We held that the dealers were entitled to take finance charges into account as they were earned over the life of the contract. In so doing, however, we distinguished cases where dealers sold their customers' paper to financial institutions and

recognized that upon such a sale an amount credited to a reserve account [retained by the financial institution] must be accrued even though such amount represents a portion of the finance charge. This distinction is based on the fact that when the paper is sold the financial institution recognizes a liability to the dealer for the amount credited to the reserve. All events have occurred to fix the right to receive that amount. It must therefore be accrued. . . .

17. In 1966 the taxpayer had more than $74 million, and in 1967 more than $75 million, invested in real estate. In these two years, the years to which this issue relates, the taxpayer acquired more than 250 residential and commercial mortgages and purchased ownership interests in six real estate parcels.

18. The record discloses that only approximately 10% of the investment opportunities reviewed are eventually funded.

ed. Under the proposed arrangement, a corporation, Pentland Development Corporation (Pentland) was formed, which entered into a contract to purchase from the owner the parcel of real estate which was to be the site for the project. Pursuant to the terms of the taxpayer's agreement with Pentland, Pentland then assigned to the taxpayer its rights under the purchase agreement with the owner.

Pentland's attempt to secure the necessary rezoning of the property was unsuccessful. As a result, the taxpayer executed a release of the assignment of the right to acquire the property. Pentland had expended the sum of $14,632.56 in the attempt to secure the necessary rezoning and sought to have the taxpayer reimburse it for these expenses. The taxpayer denied any liability for these expenses. Ultimately, this dispute was resolved by the taxpayer paying to Pentland the sum of $10,000 as reimbursement of its expenses.

The taxpayer received no direct investment income from the expenses for which it reimbursed Pentland.

(2) In 1966 the taxpayer examined the feasibility of developing a new home office location and a shopping and business complex in the Monument Square area of Portland, Maine. For this purpose, the taxpayer hired a development consultant, Spencer M. Hurtt Associates, Inc., and an architectural firm, Geddes Brecher Qualls Cunningham, to study the Portland downtown area, to survey the space needs of a number of downtown businesses, and to make reports and recommendations to the taxpayer concerning the development of the area. The taxpayer also expended sums in attempting to acquire options to purchase land in the Monument Square area, for soil studies and for the reproduction of maps. A preliminary plan and a model of the area showing the preliminary development plans were prepared, as were architectural drawings detailing three or four of the potential buildings in the project.

In 1967 the taxpayer determined the Monument Square project to be unfeasi-

ble, and the project was discontinued. The taxpayer had expended the sum of $50,638.01 on the project as follows:

(a) $32,867.26 to the development consultant;

(b) $17,000 to the architectural firm for architectural studies and a wood model of the proposed development;

(c) $500 to a consultant for attempting to obtain options to purchase real estate properties in the project area;

(d) $262.41 to an engineering consultant for soil studies; and

(e) $8.34 for reproducing maps of the project area.

The taxpayer received no direct investment income from its expenditures in connection with the Monument Square project. Had the project been completed as planned, 80% of it would have constituted an investment asset of the taxpayer and the remaining 20% its home office facility.

## B. DISCUSSION

The principal question presented is whether any of the amounts expended by the taxpayer in connection with the proposed Pentland and Monument Square real estate development projects are deductible as investment expenses under Section 804(c)(1). If they are so deductible, a further question is presented as to the proper year of deductibility of certain of the Monument Square expenses. These issues concern only the taxpayer's 1967 return.

On its federal income tax return for 1967, the taxpayer deducted from its gross investment income as "investment expenses" within the meaning of Section 804(c)(1) the sum of $10,000 expended in connection with the proposed Pentland project and the sum of $50,638.01 expended in connection with the proposed Monument Square project. The Commissioner disallowed both deductions, on the ground that the expenses in question are not deductible as investment expenses under Section 804(c)(1), but are deductible, if at all, only as abandonment losses pursuant to Section 809(d)(12). In its brief, the Government also has raised for

the first time the contention that even if these expenditures are determined to be investment expenses deductible under Section 804(c)(1), the sum of $16,700 paid to the development consultant and the sum of $17,000 paid to the architectural firm, both in connection with the Monument Square project, were for services rendered in 1966 and should have been deducted in 1966 rather than in 1967.

1. *Deductibility of the expenditures as investment expenses under Section 804(c)(1).*

For the reasons to be stated, the Court concludes that the expenditures in question are deductible as "investment expenses" under Section 804(c)(1).

■ Section 804(c)(1) provides that, in order to determine a life insurance company's "investment yield" for the purpose of computing the Phase I portion of its taxable income, the taxpayer may deduct from gross investment income "investment expenses for the taxable year." The terms "investment yield" and "investment expenses" are defined in Treasury Regulation 1.804–4, which provides, in pertinent part:

§ 1.804–4 *Investment yield of a life insurance company.*

(a) *Investment yield defined.* . . . Investment yield means gross investment income (as defined in section 804(b) and paragraph (a) of § 1.804–3), less the deductions provided for investment expenses [and other items]. However, such expenses are deductible only to the extent that they relate to investment income and the deduction of such expenses is not disallowed by any other provision of subtitle A of the Code. For example, investment expenses are not allowable unless they are ordinary and necessary expenses within the meaning of section 162 . . . . .

(b) *Deductions from gross investment income*—(1) *Investment expenses.* (i) . . . "Investment expenses" are

those expenses of the taxable year which are fairly chargeable against gross investment income. For example, investment expenses include salaries and expenses paid exclusively for work in looking after investments, and amounts expended for printing, stationery, postage, and stenographic work incident to the collection of interest.

. . . . .

Thus, there are essentially two tests for determining whether a particular expenditure is deductible as an investment expense under Section 804(c)(1): first, it must "relate to" and be "fairly chargeable against" investment income (and its deduction not be disallowed by any provision of Subtitle A of the Code); [19] second, it must be an "ordinary and necessary expense" within the meaning of Section 162. The expenditures here in issue meet both of these tests.

■ The taxpayer concedes that 20% of its expenditures in connection with the Monument Square project are properly allocable to the proposed construction of a home office facility, which would not constitute an investment asset and therefore would not be deductible as an investment expense under Section 804(c)(1). With respect to the remaining 80% of its Monument Square expenditures and its total expenditures on the Pentland project, however, it is clear that these expenditures were made in connection with an investment activity. If the projects had been completed, the taxpayer would have received rental and interest income and would have acquired an investment asset. These expenses therefore meet the "related to" aspect of the first test. The Government argues that because the taxpayer received no direct investment income from its expenditures on either of these projects, the expenses cannot meet the "fairly chargeable" aspect of the first test. Viewing the taxpayer's real estate investment operations as a whole, however, it is evident that the expenditures in question were incurred in connection

---

**19.** The Government does not suggest that any other provision of Subtitle A would disallow deduction of the expenditures here in question.

with investment activity of a type customarily engaged in by the taxpayer for the purpose of generating investment income. So viewed, the expenses were "fairly chargeable" against the taxpayer's overall investment income, even though the particular expenditures did not directly generate any such income.

It is also clear that the expenditures in question qualify as "ordinary and necessary expenses" within the meaning of Section 162 as those terms have been defined by the courts. In *Commissioner of Internal Revenue v. Tellier,* 383 U.S. 687, 689–90, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185 (1966), the Supreme Court defined these terms as used in Section 162(a) as follows (citations omitted):

> Our decisions have consistently construed the term "necessary" as imposing only the minimal requirement that the expense be "appropriate and helpful" for "the development of the [taxpayer's] business." The principal function of the term "ordinary" in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset.

In *Deputy v. du Pont, supra,* 308 U.S. at 495–96, 60 S.Ct. at 367, the Supreme Court defined the term "ordinary" as follows (citations omitted):

> Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happen but once in the taxpayer's lifetime. Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved. . . . It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling.

Finally, this Court has stated the test to be whether or not the expenditures "can be characterized as 'normal, usual, or customary' in the life of the taxpayer, or 'of common or frequent occurrence' in the taxpayer's type of business." *Consumers Water Co. v. United States,* 369 F.Supp. 939, 944 (D.Me.1974).

It is evident that these expenditures meet the foregoing tests. It is undisputed that making investments, in real property and otherwise, is an integral part of the taxpayer's business and that, of the substantial number of investment opportunities reviewed and considered, only a small fraction materializes. In an investment operation of the magnitude engaged in by the taxpayer, expenditures for investigation and preliminary work on numerous proposed projects which are not ultimately funded are necessarily incurred. In the language of the Supreme Court, such expenses are " 'appropriate and helpful' for 'the development of the [taxpayer's] business,' " *Commissioner of Internal Revenue v. Tellier, supra,* and "of common or frequent occurrence in the type of business involved," *Deputy v. du Pont, supra.* In short, the expenditures incurred by the taxpayer in connection with the proposed Pentland and Monument Square projects were clearly "ordinary and necessary expenses" of the taxpayer's real estate investment business.

The Government contends that the taxpayer must treat the expenditures in question as abandonment losses deductible under Section 809(d)(12). It cites three cases in support of this position. Two of these cases, *Champlain Coach Lines, Inc. v. Commissioner of Internal Revenue,* 138 F.2d 904 (2d Cir. 1943), and *Stanley, Inc. v. Schuster,* 295 F.Supp. 812 (S.D.Ohio 1969), aff'd per curiam, 421 F.2d 1360 (6th Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51 (1970), did not rule on, or even discuss, the question of the deductibility of the expenses in question as ordinary and necessary business expenses. In these two cases the taxpayers had not sought to deduct the expenditures as ordinary and necessary expenses within the meaning of Section 162(a), but as losses within the meaning of Section 165(a).[20] The third case cited by

---

**20.** In *Champlain Coach Lines* the court held that an interstate bus company was entitled to take an ordinary loss deduction for expenses incurred by it in an unsuccessful attempt to develop an intrastate line, under Section 23(f) of the Internal Revenue Code of 1939, the

the Government, *Equitable Life Insurance Co. of Iowa v. United States*, 340 F.2d 9 (8th Cir. 1965), also did not address the present question.[21] Moreover, to allow a life insurance company such as the taxpayer, which is in the business of making investments, to deduct the expenses of investigating ventures which do not later materialize is particularly appropriate in view of the overall scheme of the 1959 Act. It is the function of the Phase I computation, of which the deduction allowed by Section 804(c)(1) is a part, to assess a company's taxable investment income. *See* S.Rep.No. 291, *supra*, 1959 U.S.Code Cong. & Ad. News at 1576, 1578–81. And it is the function of the Phase II computation, in which the Government would place the deduction for the taxpayer's Pentland and Monument Square expenses, to assess a company's taxable underwriting income. *See id.* at 1576, 1581–82. Surely, a deduction for the expenses incurred in seeking out new ventures more properly belongs in the Phase I computation.

Finally, the Government argues that to permit the deduction of these expenses as ordinary and necessary expenses of the taxpayer's investment business "would fly in the face of the well-established tax principle and rule of accounting that the costs of acquiring a capital asset must be capitalized." *See Commissioner of Internal Revenue v. Idaho Power Co.*, 418 U.S. 1, 12, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974); *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 574–75, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); *Vestal v. United States*, 498 F.2d 487, 494–95 (8th Cir. 1974). There is no question but that, as the taxpayer apparently concedes, expenditures incurred in investigating investment opportunities which ultimately materialize must be treated as capital expenditures. *Idem.* In such

circumstances, the expenses of investigation are logically assimilated into the other costs of acquiring an asset "having a useful life substantially beyond the taxable year," Treasury Regulation 1.263(a)–2(a), 26 CFR § 1.263(a)–2(a), in compliance with the general principle that the costs of acquiring an asset be treated in a manner which reflects the asset's continuing production of income to the taxpayer. *See generally Commissioner of Internal Revenue v. Idaho Power Co., supra*, 418 U.S. at 13, 94 S.Ct. 2757; *Commissioner of Internal Revenue v. Lincoln Savings & Loan Association*, 403 U.S. 345, 354–55, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); *Woodward v. Commissioner of Internal Revenue, supra*, 397 U.S. at 575–76, 90 S.Ct. 1302. It does not follow, however, that expenses incurred in the process of investigating an investment proposal which does not ultimately materialize as a capital asset must also be capitalized. *Cf. York v. Commissioner of Internal Revenue*, 261 F.2d 421 (4th Cir. 1958) (real estate developer permitted Section 162(a) deduction of costs of survey undertaken to determine feasibility of industrial development of a parcel of real estate); *Vanderbilt v. Commissioner*, 16 T.C.Mem. 1081, 1087–88 (1957) (taxpayer in business of presenting travel movies and lectures permitted Section 162(a) deduction of attorneys' fees paid in connection with unsuccessful negotiations for a possible television series); *Southern Trading Co. v. Commissioner*, 15 T.C.Mem. 1259, 1263 (1956) (taxpayer engaged in business of acquiring royalty interests in oil and gas properties permitted Section 162(a) deduction of costs of geological survey of properties in which the taxpayer ultimately decided not to invest).

The Court holds that the expenses incurred by the taxpayer for investigation and preliminary work related to the pro-

---

predecessor of the present Section 165(a). In *Stanley, Inc.*, the court allowed an ordinary loss deduction under Section 165(a) for funds expended by a real estate developer for architectural plans for an apartment house complex which failed to materialize.

**21.** *Equitable Life* concerned the proper method of reporting interest which the taxpayer was

required to refund to the government on government bonds redeemed before maturity; the court held that such refunds constituted Section 165(a) losses and not Section 162(a) expenses. 340 F.2d at 13–14. The court did not consider whether the treatment should be different in the case of a taxpayer which is in the business of seeking and making investments. *See id.* at 15.

posed Pentland and Monument Square projects (other than the 20% of the Monument Square project expenditures attributable to the taxpayer's proposed home office) are properly deductible as "investment expenses" under Section 804(c)(1).

### 2. *Proper year of deductibility.*

■ The Government contends that even if the expenditures in question were investment expenses deductible under Section 804(c)(1), $16,700 of the $32,867.26 paid to the development consultant and the $17,000 paid to the architectural firm in connection with the Monument Square project were for services rendered to the taxpayer in 1966 and cannot be allowed as deductions in 1967. The taxpayer concedes that the services corresponding to the $16,700 paid to the development consultant were for services rendered during 1966, that the taxpayer's liability for these services was incurred and payment was made in 1966, and that 1966 was therefore the proper year of deduction for the $16,700 expense. *See* Treasury Regulation 1.461–1(a)(2). With respect to the $17,000 paid to the architectural firm, however, the record discloses that this sum was paid for the production of a wooden scale model which was not delivered to the taxpayer until January 1967. Even though work on the model may have been done in 1966, the model was not received by the taxpayer until 1967; and 1967 was therefore the proper year of deduction. *See idem.*

The Court holds that 1967 was the proper year for deduction of the expenses incurred by the taxpayer for investigation and preliminary work related to the proposed Pentland and Monument Square projects, other than the sum of $16,700 paid in 1966 to the development consultant, Spencer M. Hurtt

Associates, Inc., for services rendered in 1966.

### IV. ISSUES INVOLVING LIFE INSURANCE RESERVES

Each of the remaining three counts of the taxpayer's complaint concerns the propriety of determinations by the Commissioner disallowing life insurance reserves maintained by the taxpayer. The effect of these determinations was to reduce the taxpayer's "life insurance reserves," as defined in Section 801(b), and thereby to increase the proportion of the taxpayer's investment yield which represented investment income taxable to the taxpayer. *See* Sections 804(a), 805(a), (c); *Introduction: The Taxing Formula, supra.* Each of these counts turns on the question whether a particular reserve or portion thereof is a "life insurance reserve" within the meaning of Section 801(b).

Section 801(b) provides, in pertinent part:

(b) *Life insurance reserves defined.—*

(1) *In general.*—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) . . . life insurance reserves must be required by law.[22]

---

**22.** These provisions of Section 801(b) are derived from statutes and case law beginning in at least 1909. The requirement of Section 801(b)(2) that life insurance reserves be "required by law" stems from Section 38 of the Act of August 5, 1909, ch. 6, 36 Stat. 11, 112, which allowed insurance companies to deduct from gross income "the net addition, if any, required by law to be made within the year to reserve funds." *See McCoach v. Insurance Co.*

*of North America,* 244 U.S. 585, 586, 37 S.Ct. 709, 61 L.Ed. 1333 (1917). The definition of life insurance reserves contained in Section 801(b)(1) was first incorporated into the Code in the Revenue Act of 1942, ch. 619, tit. I, § 163(a), 56 Stat. 867, *codified at* Internal Revenue Code of 1939, 26 U.S.C. § 201(c)(2), but reflected definitions stated in prior judicial decisions. *See Maryland Casualty Co. v. United States,* 251 U.S. 342, 350, 40 S.Ct. 155, 64 L.Ed.

A life insurance company establishes life insurance reserves for the purpose of assuring that the company will have funds on hand to pay claims on policies as they become due in the future. In *United States v. Atlas Life Insurance Co.,* 381 U.S. 233, 236 n. 3, 85 S.Ct. 1379, 1381, 14 L.Ed.2d 358 (1965), the Court defined life insurance reserves as "that fund which, together with future premiums and interest will be sufficient to pay future claims" of policyholders. These reserves are not actually trust funds or segregated assets, but merely statements of liability. Nonetheless, the company must have assets at least equal to its reserves, and it is only the assets in excess of the reserve liabilities that may be utilized by the company for purposes other than meeting policy obligations.

A life insurance company's reserves come from essentially two sources: (1) a portion of each premium received is set aside for this purpose, and (2) these portions are invested and produce earnings which are added to the reserve. This portion of a premium is called the "net premium" or the "net valuation premium." This is the amount which, with interest accretions, must be added to the reserve each year so that if the company's actual experience exactly matches the assumptions made, the amount of the reserve will be exactly sufficient to pay all claims as they come due. The total premium charged a policyholder is called the "gross premium." The difference between the gross and net premiums is called "loading" and is used to pay the company's administrative and operating expenses.

Mandatory minimum standards for the calculation of a life insurance company's reserve requirements have been established by the Standard Valuation Law, which has been enacted in all states, including Maine. *See* 24 Me.Rev.Stat.Ann. §§ 2051–2057 (1965).[23] The Standard Valuation Law requires that the State Commissioner of Insurance annually value the reserve liabilities of each life insurance company doing

business in the state and may certify the reserves as adequate. 24 Me.Rev.Stat.Ann. § 2052. To this end, the taxpayer each year submits an elaborate annual financial statement prepared according to a form developed and maintained by the National Association of Insurance Commissioners (N.A.I.C.). The annual statements contain exhaustive calculations of the taxpayer's condition and affairs, including its reserve liabilities. It is stipulated that for each of the years in question the taxpayer prepared its annual statements "under the method of accounting in a manner approved by the N.A.I.C." for that purpose. Moreover, evidence submitted by the taxpayer shows that for each of the years in question, its annual statement was reviewed by the Maine Commissioner, its reserves were audited by an independent actuary employed by the Commissioner and found to be correct, and its annual statement was so certified by the Commissioner.

The theory under which reserves are calculated is stated formulaically in the Standard Valuation Law, 24 Me.Rev.Stat. Ann. § 2054, as

> the excess . . . of the present value, at the date of valuation, of [the] future guaranteed benefits provided for by [outstanding] policies, over the then present value of any future . . . net premiums therefor.

That is, assuming that the company will realize a certain rate of return on its investments and assuming that future claims will arise in a manner consistent with the predictions contained in certain mortality tables, the company can calculate a sum which, together with future premiums, will be sufficient precisely to meet its obligations to its policyholders. The sum is the reserve. The critical assumptions used in this calculation—rate of return on investments and policyholder mortality rates—are set by the Standard Valuation Law. That law, prescribes, for example, that the com-

297 (1920). *See also* S.Rep.No. 291, *supra,* at 1577–78; Rev.Rul. 70–190, 1970–2 Cum.Bull. 150.

**23.** The pertinent sections of the Maine Standard Valuation Law are set out in an appendix.

pany assume a rate of interest not greater than 3½ percent and that it utilize the 1958 Commissioner's Standard Ordinary Mortality Table for the purpose of calculating the reserves required to meet its obligations under "ordinary policies of life insurance." 24 Me.Rev.Stat.Ann. § 2053(1).[24]

The three disputed determinations made by the Commissioner regarding the taxpayer's reserve liabilities are the following:

A. Whether the taxpayer's reserves for unexercised guaranteed insurability rider options qualify as life insurance reserves under Section 801(b). (Count IV.) This issue concerns the taxpayer's returns for the years 1962 through 1968.

B. Whether the taxpayer's reserves for yearly-renewable group term and individual term life insurance policies qualify as life insurance reserves under Section 801(b). (Count V.) This issue concerns the taxpayer's returns for the years 1962 through 1966.

C. Whether the taxpayer's unearned premium reserves for noncancellable accident and health policies qualify as life insurance reserves under Section 801(b). (Count VI.) This issue concerns the taxpayer's returns for the years 1962 through 1968.

## A. RIDER OPTION RESERVES (COUNT IV)

### STATEMENT OF FACTS

The taxpayer issues life insurance policies which contain options to purchase additional insurance at the taxpayer's standard premium rate at specified future dates regard-

less of whether the policyholder can present evidence of insurability (that is, pass a medical examination) at the time he exercises an option. At the time the policyholder purchases a policy with such a rider, he must provide evidence of insurability. Such evidence indicates that the policyholder is a "select life," one posing a better-than-average risk to the insurer. The taxpayer knows, however, that as time passes at least some policyholders in the group of select lives will deteriorate, becoming average or below-average risks at the time they reach the attained option ages. If the policyholders who have become below-average risks should exercise their options, the taxpayer will incur greater mortality costs with respect to this additional insurance than it normally would. The parties have stipulated that the present value of the future benefits under life insurance policies issued pursuant to guaranteed insurability riders can be assumed to be greater than under a policy which is identical in all respects but which is issued after receiving evidence of insurability.

For the option of requiring the taxpayer to forego its usual requirement that an applicant for insurance present evidence of insurability, the taxpayer charges a surcharge on its usual premium. The taxpayer allocates this surcharge to a reserve designed to cover the greater-than-normal future claims which can be expected to arise on additional insurance purchased pursuant to these options. For the years in question, this reserve was calculated on the basis of three assumptions: (1) an assumed rate of interest of 2½ percent; (2) assumed mortality calculated on the basis of the 1958 CSO mortality table, the N.A.I.C. table for "ordi-

---

**24.** There is no doubt but that the assumptions prescribed by the Standard Valuation Law lead to a very conservative determination of required reserves. The 3½ percent rate of return would appear to be substantially lower than the rate a company could realistically expect to realize; and the prescribed mortality table significantly understates the life expectancies of a company's policyholders. The effect of these assumptions is to overstate actual reserve requirements. The state policy underlying these prescriptions is clear and well-considered: the

state's concern is to assure beyond reasonable doubt that policyholders' claims will be paid. This objective tends to conflict, however, with the federal internal revenue objective of realizing tax revenues in accordance with the real economic situation of the taxpayers. Nonetheless, it is clear from Section 801(b) and from the legislative history of the 1959 Act that Congress intended generally to adopt the methods of reserves computation established pursuant to state law. See S.Rep.No. 291, *supra*, at

nary lives"[25]; and (3) an assumed 100 percent rate of exercise of the options.

## DISCUSSION

The issue presented is whether the taxpayer's reserves for unexercised guaranteed insurability rider options qualify as life insurance reserves under Section 801(b). This issue relates to the taxpayer's returns for the years 1962 through 1968. In its N.A.I.C. annual statements and federal income tax returns for these years, the taxpayer included reserves for unexpired and unexercised rider options. The Commissioner, however, disallowed the inclusion of these reserves as life insurance reserves within the meaning of Section 801(b).

The Government presents two grounds on which it contends that the taxpayer's reserves for unexercised and unexpired guaranteed insurability rider options are not life insurance reserves within the meaning of Section 801(b). These are: (a) that these reserves are not "computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest," as required by Section 801(b)(1)(A); and (b) that these reserves are not "required by law," as required by Section 801(b)(2).

■ (a) The first ground advanced by the Government is without merit. It rests on the contention that no reserve can be included as a life insurance reserve within the meaning of Section 801(b) unless it is based *solely* on recognized mortality tables and assumed rates of interest. The Government would therefore deem these reserves not to be within the meaning of the Section because the taxpayer included in this calculation the non-actuarial assumption that 100 percent of the unexpired options would be exercised. The wording of the statute does not appear to carry such a meaning, and the Government has cited no authority in support of the interpretation it advances here.[26] In the only prior decision in which the Government has advanced this argument, it was rejected. *Mutual Benefit Life Insurance Co. v. Commissioner of Internal Revenue,* 488 F.2d 1101, 1104, 1106–08 (3d Cir.), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974).[27] Finding no support in the statute or case law for such an interpretation of Section 801(b)(1)(A), the Court agrees with the taxpayer that Section 801(b)(1)(A) does not prohibit use of non-actuarial assumptions such as that made by the taxpayer in this instance in the calculation of life insurance reserves.

■ (b) It is also clear that the rider option reserves established by the taxpayer were "required by law" within the meaning of Section 801(b)(2). This requirement is amplified somewhat in Treasury Regulation

---

1659–60 (separate views of Senators Douglas and Gore).

**25.** During certain years the 1941 CSO table was used.

**26.** Treasury Regulation 1.801–4, which was promulgated under Section 801(b), contains no such restriction. Nor do a series of court decisions cited by the Government lend support to this argument. These cases held that certain "reserves" established to meet a life insurance company's contractual obligations could not be recognized under predecessors to Section 801(b). *See, e. g., McCoach v. Insurance Co. of North America, supra; Continental Assurance Co. v. United States,* 8 F.Supp. 474, 79 Ct.Cl. 756 (1934). The Government acknowledges that the "reserves" at issue in these cases involved "only non-life contingencies." For example, in *Continental Assurance Co.,* the reserve at issue was established to meet payments to beneficiaries under life policies who had declined to receive such payments when

due but had left them on deposit with the taxpayer in order to collect interest. 8 F.Supp. at 478. The establishment of a reserve to meet such fully matured obligations was obviously not based on any assumption regarding rates of mortality or morbidity. A holding that this was not a proper reserve hardly supports the position that a taxpayer may not calculate a reserve on the basis of the two assumptions enumerated in Section 801(b)(1)(A), plus a third, as was done in the present case.

**27.** *See also* Regulation 1.806–4(b), which in referring to the treatment of a change in the basis by which a taxpayer calculates its reserves speaks of a change "by reason of a change in mortality or interest assumptions, or *otherwise*" (emphasis added). The latter phrase appears to presume that assumptions other than the first two may legitimately be employed in the computation of reserves.

1.801–5(b), which provides, in pertinent part:

> [T]he term "reserves required by law" means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries.

The rider option reserves clearly meet the latter two requirements of this Regulation: they were reported in the taxpayer's annual statements and were accepted by the Maine Commissioner of Insurance, and apparently in the other states where the taxpayer does business. The record also supports the taxpayer's contention that these reserves were "required . . . by express statutory provisions" [28] within the meaning of the Regulation. The Standard Valuation Law does not attempt to list all types of reserves which a life insurance company must maintain. Rather, it provides a categorical definition, 24 Me.Rev.Stat.Ann. § 2054:

> *Commissioner's reserve valuation method defined*
>
> Reserves according to the commissioner's reserve valuation method, for the life insurance and endowment benefits of policies providing for a uniform amount of insurance and requiring the payment of uniform premiums shall be the excess, if any, of the present value, at the date of valuation, of such future guaranteed benefits provided for by such policies, over the then present value of any future modified net premiums therefor. . .
>
> \* \* \* \* \* \*
>
> Reserves according to the commissioner's reserve valuation method for:
>
> A. Life insurance policies providing for a varying amount of insurance or requiring the payment of varying premiums,
>
> B. Annuity and pure endowment contracts,
>
> C. Disability and accidental death benefits in all policies and contracts, and
>
> D. All other benefits, except life insurance and endowment benefits in life insurance policies,
>
> shall be calculated by a method consistent with the principles of the preceding paragraph, except that any extra premiums charged because of impairments or special hazards shall be disregarded in the determination of modified net premiums.

The only expert witness to testify on the requirements of Maine law testified that the rider option reserves were in fact required under this definition, and the Maine Commissioner of Insurance has advised the taxpayer that

> it is my belief that under Title 24, Section 2054, Sub-paragraph 2–D of M.R.S.A. 1964, it would be necessary for life insurance companies such as yours to carry reserves on Guaranteed Insurability Riders. As Insurance Commissioner of this jurisdiction, if at the time of examination of your company it was noted that reserves were not carried on the aforementioned type of policies, I would find it necessary to advise you to set up such reserves.

Moreover, the Government's only witness on this issue admitted that these reserves were proper and "a legitimate reserve liability." These reserves were incontestably set aside for the purpose of assuring that the taxpayer would be able to meet claims on insurance purchased pursuant to the rider options. They were established for the purpose of paying future benefits guaranteed to the policyholder upon the exercise of his option. Accordingly, in the absence of illuminating precedents offered by either party, the Court finds that these reserves were required by state law within the

---

**28.** The record indicates that no rules or regulations have been promulgated by any state insurance department requiring the reserves in question.

meaning of Section 801(b) and Regulation 1.801–5(b).[29]

The Court holds that the taxpayer's reserves for unexercised guaranteed insurability rider options qualify as life insurance reserves within the meaning of Section 801(b).

### B. UNEARNED PREMIUM RESERVES FOR TERM LIFE INSURANCE POLICIES (COUNT V) STATEMENT OF FACTS

The taxpayer issues yearly-renewable term life insurance policies, both individual and group, and charges an annual gross premium therefor. The gross premium, as stated above, consists of a net premium and loading. The net premium portion is that sum which, as computed on the basis of recognized mortality tables and an assumed rate of interest provided by the Standard Valuation Law, will be exactly sufficient to provide the benefits guaranteed under the policy. The loading portion is not calculated on the basis of these assumptions and is designed to meet the administrative costs of the insurer. At any point in the policy year the annual gross premium may also be characterized as consisting of an "earned" and "unearned" portion. The unearned gross premium is the portion which has been paid but not yet exhausted in meeting the insurer's obligations to the policyholder; it is the portion of the gross premium which corresponds to the period of time remaining in the policy year.

At the end of each calendar year the taxpayer has in force individual and group term life insurance policies on which the premiums for portions of the next calendar year have been paid. The taxpayer must continue to provide coverage with respect to these policies for that portion of the next calendar year without receiving any additional premiums. The taxpayer knows from its standard mortality tables and from experience, that a certain number of these policies will result in claims during the period of coverage remaining. It is stipulated that reserves based upon the net premium portion of these unearned premiums would be equal to the future benefits payable on the underlying policies. In other words, if the taxpayer's experience were identical to its mortality and interest assumptions, the amount of such reserves at year end, plus the interest earned thereon in the subsequent calendar year, would be equal to the amount paid in claims during the periods for which the premiums have been paid.[30]

29. This conclusion makes it unnecessary to reach the taxpayer's contention that it was at any rate required to maintain such reserves, once established, by Section 2056 of the Standard Valuation Law. *See Mutual Benefit Life Insurance Co. v. Commissioner of Internal Revenue, supra,* at 1106.

30. This principle is illustrated by the following example set forth in the stipulations submitted by the parties:

Assume, for example, that a group policy is written insuring the lives of 10,000 people for $1,000 each, with the premium due annually on December 1, and that the average age of the group insured is 30. Assume also that the assumed interest rate is 3%. The net premium for policies currently issued would be determined from the 1960 CSG mortality table, according to which the death rate for this age group is 2.4 per thousand. Thus with this group there would be expected to be 24 claims and $24,000 in benefits to be paid out during the term of the policy. These claims can be assumed to be paid evenly throughout the year [an inaccurate assumption, *see infra*] or in the middle of the year on the average. Thus, the net premium would earn interest for only a half year before being required to pay the claims anticipated. It is therefore necessary to compute the amount which, with interest for one-half year at the rate of 3%, will equal $24,000 at the end of that period. The present value of $1.00 discounted for one-half year at 3% interest is .985329. This, multiplied by $24,000 equals $23,647.90, which is the net premium for this policy. This is the amount which under the above assumptions must be set aside at the inception of the policy to provide funds for the payment of claims during the policy year.

Again assuming deaths occur evenly throughout the policy year, as of the end of December only $1/12$ of the death claims which must be paid from this reserve have been incurred and $11/12$ of the claims are yet to occur. Thus $11/12$ of the net premium, or $21,677.24 must be set aside in a reserve. This amount, together with its interest accumulations, is held to satisfy the claims during the next 11 months. If the actuarial and interest assumptions match precisely the company's experience, this amount will all be expended in the payment of claims in the period remaining in the policy year.

For the calendar years 1962 through 1966, the taxpayer established reserves for group and individual yearly-renewable term life insurance policies in an amount equal to the gross unearned premium.[31] These reserves were reported on its N.A.I.C. annual statements and were accepted by the Maine Commissioner of Insurance. These reserves were also included in the taxpayer's "life insurance reserves" on its federal income tax return for each of these years. These reserves were disallowed, however, by the Commissioner. The taxpayer has since recomputed these reserves in an amount equal to the net unearned premium, but the Government continues to disapprove their inclusion as life insurance reserves.

## DISCUSSION

The issue presented is whether the taxpayer's gross unearned premium reserves for yearly-renewable group term and individual term life insurance policies qualify as life insurance reserves under Section 801(b), and, if not, whether the taxpayer can recompute these reserves on a net unearned premium basis.

 The taxpayer contends that the gross unearned premium reserves which it established are "life insurance reserves" within the meaning of Section 801(b).[32] The taxpayer further argues that, even if the Commissioner's disallowance of its gross unearned premium reserves is upheld, it should be allowed to include reserves computed on a net unearned premium basis. The Government takes the position that the reserves should have been reported on a net unearned premium basis and that the taxpayer cannot recompute the reserves at this late date. For the reasons to be stated, the Court rejects the taxpayer's first contention but accepts the second.

In support of its first contention, the taxpayer adduces uncontroverted expert testimony that an assumption used in the calculation of the unearned net premium reserves in fact understates its future obligations to policyholders. The assumption in question is that deaths will occur at an even rate throughout the policy year. *See* note 30, *supra.* The testimony of the taxpayer's experts was that deaths in fact occur at a slightly increasing rate during the year. To allocate only one-half of the net premium to the latter half of a policy year would therefore slightly understate the taxpayer's reserve liabilities. On this reasoning, the taxpayer argues that it is justified in computing reserves on the basis of the gross premium in order to assure no understatement of its reserve liabilities.

Such a justification does not bring the taxpayer's reserve computation within the requirements of Section 801(b). First, it is clear that the inclusion of loading in its computation causes a substantial overstatement of its reserve liabilities. The loading portion of the gross premium was designed to meet administrative costs, and it appears to be only coincidence that the taxpayer should have used it to compensate for a shortfall that would result from using only the net premium in reserves calculations. The use of the loading in calculating reserves thus introduces an element computed with reference to expenses other than reserve liabilities. To allow loading to be included in the calculation of reserves would be contrary to the language of Section 801(b)(1), which imposes a definition of "life insurance reserves" which clearly seeks to restrict these amounts to sums calculated on the basis of a need to meet obligations to policyholders and actually used by a life insurance company for that purpose. Second, the use of the loading

31. In computing the gross unearned premium reserve for yearly-renewable group life policies, the taxpayer inventoried each policy and determined that portion of the gross premium which was unearned. On individual policies, the taxpayer assumed that all premiums were paid annually in advance and that the policies were issued evenly throughout the year, or on July 1 on the average. On this assumption the reserve for individual policies was calculated as one-half the gross premium.

32. The taxpayer indicated at oral argument that it was not pressing this contention; but since the issue was fully briefed, the Court will deal with it.

portion of the premium is also clearly not required by state law, which speaks of calculating reserves from the net premium. 24 Me.Rev.Stat.Ann. § 2054. The taxpayer has produced no evidence establishing that the Maine Commissioner of Insurance required that these reserves be calculated on the basis of the gross, rather than the net, premium. Reserves computed on the basis of the gross premium are therefore not "required by law" within the meaning of Section 801(b)(2) and Regulation 1.801–5(b).[33]

 The further question presented is whether, having originally computed these reserves on a gross-premium basis, the taxpayer must pay a tax based on the complete elimination of these reserves or whether it may now recompute them on a net-premium basis. It is clear, as the Government agrees, that if the taxpayer had originally computed these reserves on a net-premium basis, they would have qualified as life insurance reserves under Section 801(b). The reserves would have been computed entirely on the basis of recognized actuarial considerations and would have been as required by the Standard Valuation Law. *See Commissioner of Internal Revenue v. Monarch Life Insurance,* 114 F.2d 314, 321 (1st Cir. 1940). The Government objects to their recomputation and inclusion at this time, however, on the ground that certain Treasury Regulations would be violated. These Regulations require that reserves "actually be held" by the taxpayer during the year for which they are claimed, 26 C.F.R. §§ 1.801–4(a), 5(a), and that they be reported in the taxpayer's N.A.I.C. annual statement and accepted by the state regulatory authorities as a reserve liability. 26 CFR § 1.801–5(b). The Government argues that since the taxpayer did not recompute its reserves until 1976, ten years after the last

taxable year for which they are claimed, they cannot possibly meet these requirements. This argument ignores the obvious fact that the reserves computed on a gross-premium basis necessarily included as a portion thereof, reserves computed on a net-premium basis. Holding and reporting the former in the years in question logically means that the taxpayer held and reported the latter; and in approving the taxpayer's annual statement the Commissioner of Insurance—whose concern is to assure adequate reserves—certainly implicitly accepted that the lesser sum was a reserve required by state law. Nor does the decision of the Tax Court in *Pacific Mutual Life Insurance Co. v. Commissioner,* 48 T.C. 118 (1967), rev'd on other grounds, 413 F.2d 55 (9th Cir. 1969), forbid a recomputation in the instant case. In *Pacific Mutual* the taxpayer was attempting to amend its reserves "to conform to its subsequent actual experience." The court held that such a recomputation would be in violation of the requirement of the 1959 Act that reserves be estimations of liability computed in advance. 48 T.C. at 129. In the instant case, however, the taxpayer is merely attempting to correct an error in the assumptions it made when it originally computed these reserves. Such a recomputation in no way infringes the concept of reserves as estimated liabilities.

The Court holds: (1) that the taxpayer's gross unearned premium reserves for yearly-renewable group and individual term life insurance policies do not qualify as life insurance reserves under Section 801(b); (2) that the taxpayer is entitled to recompute those reserves on a net-premium basis; and (3) that, as so recomputed, the reserves qualify as life insurance reserves under Section 801(b).

---

**33.** Authorities adduced by the taxpayer are inapposite. *In Commissioner of Internal Revenue v. Monarch Life Insurance Co.,* 114 F.2d 314, 321 (1st Cir. 1940), the court held that certain unearned premium reserves were appropriate reserves for federal tax purposes. The court did not focus, however, on the distinction, relied on by the Government in the instant case, between gross and net premiums.

Moreover, in *Monarch Life* the court found that the "entire premium is based on experience tables and an assumed rate of interest." *Idem.* This finding clearly distinguishes that decision from the instant case, where only the net portion of the premium is computed from actuarial assumptions and the remainder, the loading, is computed to meet non-actuarial purposes.

## C. UNEARNED PREMIUM RESERVES FOR NONCANCELLABLE ACCIDENT AND HEALTH POLICIES (COUNT VI) STATEMENT OF FACTS

During the years in question, the taxpayer issued noncancellable accident and health insurance policies. Under the terms of these policies, the premiums remain level throughout the life of the policy and the policy cannot be cancelled so long as the policyholder continues to pay the premiums. As with life insurance policies, premiums for noncancellable accident and health policies are paid in advance of the period of coverage; and again as with life insurance policies, the taxpayer as of December 31 of each calendar year has received premiums which relate to insurance coverage to be provided in the subsequent calendar year.

The taxpayer establishes a total reserve for these policies, which is divided into two portions, the "midterminal reserve" and the so-called "unearned premium" reserve. A terminal reserve is the amount which, as of the end of the policy year, must be held by the company to meet insurance costs in subsequent years when the premiums received are insufficient for this purpose.[34] The midterminal reserve is simply the average of the prior year's and the current year's terminal reserve. The "unearned premium" reserve is the portion of the premiums paid in advance which, as of the end of the calendar year, entitle the policyholder to a period of coverage during the subsequent calendar year.

On its N.A.I.C. annual statements for the years 1962 through 1968 the taxpayer reported its midterminal reserves in Item 2 of Part I of Exhibit 9 and its unearned premium reserves in Item 1 of Part I of Exhibit 9. On the annual statements the taxpayer reported these reserves on a gross premium basis.

On its tax returns for the years in question, the taxpayer reduced its gross unearned premium reserves to unearned net premium reserves and included them in "life insurance reserves." The Commissioner allowed the midterminal portion of the reserves as a proper life insurance reserve, but disallowed the inclusion of the unearned premium portion of these reserves as a life insurance reserve within the meaning of Section 801(b).

### DISCUSSION

The issue presented is whether the taxpayer's unearned premium reserves for noncancellable accident and health insurance policies qualify as life insurance reserves under Section 801(b). This issue concerns the taxpayer's returns for the years 1962 through 1968.

Analysis of the judicial and legislative history underlying the present definition of life insurance reserves in the 1959 Act persuades the Court that the taxpayer's unearned premium reserves for its noncancellable accident and health insurance policies do not qualify as "life insurance reserves" within the meaning of Section 801(b).

Under Section 203(a)(2) [35] of the Revenue Acts of 1932 and 1934, 47 Stat. 224, 48 Stat.

---

**34.** As is true with respect to life insurance policies, the cost of providing coverage pursuant to noncancellable accident and health insurance policies increases with the age of the insured, while the premium charged to the insured remains level throughout the period of coverage. As a result, net premium levels are established so that during the earlier years of coverage the net premiums will exceed the cost of insurance. These excess net premiums are held at interest to cover the cost of insurance in the later years of the policy when the cost of coverage will exceed the net premiums charged.

**35.** Section 203(a)(2) provided, 48 Stat. 732:

SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) *General Rule.*—In the case of a life insurance company the term "net income" means the gross income less—

\* \* \* \* \* \*

(2) *Reserve Funds.*—An amount equal to 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, except that in the case of any such reserve fund which is computed at a lower interest assumption rate, the rate of 3¾ per centum shall be substituted for 4 per centum. Life insurance companies issuing policies covering life, health, and accident insurance combined in one policy issued on the weekly premium

**1208**

732, a taxpayer meeting the definition of "life insurance company" provided in Section 201(a) [36] was entitled to deduct from its gross income 3¾ percent of its "reserve funds required by law." The 1932 and 1934 Acts contained no definition of "life insurance reserves," such as is contained in Section 801(b) of the 1959 Act. In *Commissioner of Internal Revenue v. Monarch Life Insurance Co.,* supra, the Court of Appeals for the First Circuit held that the taxpayer's unearned premium reserves on noncancellable accident and health policies were "reserve funds required by law" within the meaning of Section 203(a)(2) of the 1932 and 1934 Acts. With respect to the unearned premium reserve the court stated, *id.* at 321 (citations omitted):

> This reserve has long been recognized as the basic insurance reserve, representing as it does the amount of the premium collected proportionate to the unexpired part of the period for which it was paid. The entire premium is based on experience tables and an assumed rate of interest. This pro rata unearned portion of the premium collected is clearly a technical insurance reserve pertaining to insurance and held against "future", "unaccrued", and "contingent" claims.

The Government argued in *Monarch Life* that 3¾ percent of the taxpayer's reserves for accident and health policies could not be deducted because such reserves were not "life insurance reserves," that is, reserves maintained to pay death benefits under life insurance policies. *Id.* at 323. The court, however, rejected this contention on the ground that, once a taxpayer had established that it was a "life insurance company" under Section 201(a), Section 203(a)(2) prescribed no such limitation on the charac-

ter of the reserves with respect to which a deduction was allowed. The court stated, *id.* at 323, 325:

> The statutory system is conclusive against the Commissioner, Section 201(a) of the Revenue Acts here in question defines life insurance companies as: "an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds". . . .

> This section provides a test by which one is to ascertain whether a given company is to be taxed as a life company or as a mutual company or one other than life or mutual. Once a company has been found to be a life insurance company under this definition, the type of its policies is no longer important; all its business is treated as though it were life insurance.

> \* \* \* \* \* \*

> If Congress had intended to limit the reserve deduction to life reserves it could easily have said so. In the absence of explicit language, the general meaning of the words as previously construed to apply to other than life reserves should be accepted. . . .

In the Revenue Act of 1942, 56 Stat. 867–868, 870, Congress repealed the provisions of the 1932 and 1934 Acts discussed in *Monarch Life* and replaced them with the following revised definitions of "life insurance company" and "life insurance reserves":

> SEC. 201. TAX ON LIFE INSURANCE COMPANIES.
> (a) *Definition.*—When used in this title the term "life insurance company" means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.

---

payment plan, continuing for life and not subject to cancellation, shall be allowed, in addition to the above, a deduction of 3¾ per centum of the mean of such reserve funds (not required by law) held at the beginning and end of the taxable year, as the Commissioner finds to be necessary for the protection of the holders of such policies only;

\* \* \* \* \* \*

**36.** Section 201(a) provided, 47 Stat. 223, 48 Stat. 731:

Sec. 201. LIFE INSURANCE COMPANIES.

\* \* \* \* \* \*

(b) *Definition of Life Insurance Company.*—When used in this chapter, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, and the life insurance reserves (as defined in subsection (c)(2)) plus unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves, of which comprise more than 50 per centum of its total reserves. For the purpose of this subsection, total reserves means life insurance reserves, unearned premiums and unpaid losses not included in life insurance reserves, and all other insurance reserves required by law. . . .

(c) *Other Definitions.*—In the case of a life insurance company—

\* \* \* \* \* \*

(2) *Life Insurance Reserves.*—The term "life insurance reserves" means amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Such life insurance reserves, except in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation and except as hereinafter

provided in the case of assessment life insurance, must also be required by law.

. . .

\* \* \* \* \* \*

The legislative history of the 1942 Act clearly establishes that Congress' purpose in so amending the prior definition of "life insurance company" and in adding a definition of "life insurance reserves" was to draw a distinction between "life insurance reserves" and "unearned premiums" on noncancellable accident and health policies. The latter were not to be treated as "life insurance reserves" but were to be included in reserves only for purposes of the definition of "life insurance company." Thus the Senate Finance Committee Report states, S.Rep.No.1631, 77th Cong., 2d Sess., 1942–2 Cum.Bull. 504, 611–12:

> Technical changes are made to distinguish in a clearer manner the types of insurance contracts included and to emphasize the fact that the unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are included for purposes of the definition of a life insurance company only. Since noncancelable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks, the writing of such insurance is analogous to life insurance and the definition has been changed to permit such companies to be taxed as life insurance companies. The unearned premiums and unpaid losses on noncancelable life, health and accident policies, not included in life insurance reserves, are added to such reserves in determining whether a company is to be considered a life insurance company. The life insurance reserves defined in subsection (c)(2) as they pertain to noncancelable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the

cost of carrying the risk will be greater than the premiums then being received.

. . . . .

The Report of the House Committee on Ways and Means contains substantially identical statements. H.R.Rep.No.2333, 77th Cong., 1st Sess., 1942–2 Cum.Bull. 372, 453–54.

■ The 1959 Act adopted, without substantive change, the definitions of "life insurance company" and "life insurance reserves" provided in the 1942 Act. Sections 801(a) and 801(b).[37]

The foregoing legislative history makes clear that in the 1942 Act Congress established a distinction, which has been preserved by the 1959 Act, between life insurance reserves and unearned premium reserves on noncancellable accident and health policies. This history plainly discloses the Congressional intent that only the midterminal reserves—those reserves maintained to meet the taxpayer's obligations arising in future years—qualify as life insurance reserves and that the unearned premium reserves for such policies are to be considered only for the purpose of determining whether the taxpayer meets the definition of a life insurance company. Such a distinction is plainly set out in the Section 801(a) definition of life insurance company, which differentiates between "life insurance reserves," Section 801(a)(1), and "unearned premiums . . . on noncancellable life, health, or accident policies not included in life insurance reserves." Section 801(a)(2).

The distinction between midterminal reserves and unearned premium reserves is further supported by the applicable Treasury Regulations. In providing examples for reserves which do not qualify as "life insurance reserves," Regulation 1.801–4(e)(3) includes "[t]he unearned premiums . . . on noncancellable life, health, or accident policies . . . not included in life insurance reserves."[38] Regulation 1.801–4(a) provides that "life insurance reserves" within the meaning of Section 801(b) are "[g]enerally [those which] . . are held to supplement the *future* premium receipts when the latter, alone, are insufficient to cover the increased risk in the later years" (emphasis supplied). *See also* 26 CFR §§ 1.801–3(c), (e), 1.801–4(d)(3), 1.801–5(a)(1), (2).

Neither party has cited any judicial authority that has reached the present question since passage of the 1942 Act. The Internal Revenue Service has ruled, however, consistently with the foregoing views, that the unearned premium reserves on noncancellable health and accident policies do not qualify as life insurance reserves. Rev.Rul. 70–460, 1970–2 Cum.Bull. 135. This ruling has been cited favorably by two courts. *Economy Finance Corp. v. United States,* 501 F.2d 466, 481 n.28 (7th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425, (1975); *Group Life & Health Insurance Co. v. United States,* 434

---

**37.** Section 801(a) of the 1959 Act defines "life insurance company" as follows:

(a) *Life insurance company defined.*—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus·

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

Section 801(b), the definition of "life insurance reserves" is set out in the text at note 22, *supra.*

**38.** Regulation 1.801–4(e)(3) follows the intent of Congress in the 1942 and 1959 Acts to distinguish between reserves included for the purpose of determining whether a taxpayer is a "life insurance company" under Section 801(a) and reserves included in "life insurance reserves" under Section 801(b). The Regulation further provides that

unearned premiums . . . shall be taken into account under Section 801(a)(2) for purposes of determining whether an insurance company is a life insurance company.

F.2d 115, 119 n.10 (5th Cir. 1970), *cert. denied,* 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112 (1971).

The foregoing views also receive some additional support from decisions holding that reserves maintained on cancellable accident and health insurance policies are not life insurance reserves within the meaning of Sections 801(a) and 801(b). *United Benefit Life Insurance Co. v. McCrory,* 414 F.2d 928 (8th Cir. 1969), *cert. denied,* 396 U.S. 1039, 90 S.Ct. 687, 24 L.Ed.2d 684 (1970); *United States v. Occidental Life Insurance Co. of California,* 385 F.2d 1 (9th Cir. 1967). These decisions point out that the reason Congress in the 1942 Act allowed life insurance companies to deduct income allocable to reserves kept for uncancellable, but not for cancellable, accident and health insurance policies was that only the former placed on the company any liability for claims accruing after the close of the current policy year. *United Benefit Life Insurance Co. v. McCrory, supra,* at 935–36; *United States v. Occidental Life Insurance Co. of California, supra,* at 7. It would be inconsistent to construe Section 801(b) as allowing a deduction for unearned premium reserves on noncancellable health and accident policies but as not allowing a deduction for reserves of the same type and purpose held on cancellable policies.

The Court holds that the taxpayer's unearned premium reserves for noncancellable accident and health insurance policies do not qualify as life insurance reserves under Section 801(b).

## V. DEFERRED AND UNCOLLECTED PREMIUMS (THE COUNTERCLAIM) STATEMENT OF FACTS

In the life insurance industry, the gross premium is the amount actually charged the insured each year for the benefits provided by the life insurance policy. The gross premium is specified in the policy and is guaranteed not to be increased for the life of the policy. As stated above, the gross premium is comprised of two elements, the net valuation premium and the loading.

Holders of life insurance policies issued by the taxpayer may pay premiums in semiannual, quarterly or monthly installments. "Deferred premiums" are installment premiums which have not been paid prior to December 31 of the calendar year and which become due after December 31 of the calendar year and before the next policy anniversary date. "Uncollected premiums" are premiums which become due on or before December 31 but which have not been paid by year's end. As required by law, however, all life insurance policies provide for a 31-day grace period during which the policyholder may pay such premiums and during which the policy is carried in full force and effect. The insured has no obligation to pay the deferred and uncollected premiums, and the taxpayer has no contractual or other right to collect these premiums from the insured.

During the years 1958 through 1968 the taxpayer, in accord with industry practice, computed its reserves for its life insurance policies on the assumptions that a full annual premium was paid in advance on the last anniversary date of each policy, and that the anniversary date of each policy was July 1.

On its N.A.I.C. annual statement for each of the years in question the taxpayer included its net deferred and uncollected premiums as a liability in the "aggregate reserve" figure entered on line 1, page 3. In recognition of this overstatement of its reserves, the taxpayer also entered as an offsetting asset on lines 17, page 2, the amount of its net deferred and uncollected premiums. As required by the annual statement form, the taxpayer also included in income the gross amount of deferred and uncollected premiums and deducted the loading portion of such premiums. The result of these entries was that there was no net effect on the income or the surplus shown on the annual statement resulting from the inclusion in reserve liabilities of the deferred and uncollected premiums. The Maine Commissioner of Insurance certified the statements, including these entries, for each year involved; and the parties agree that

this treatment of net deferred and uncollected premiums is not inconsistent with the principles established by the N.A.I.C.

On its federal income tax returns for the years 1958 through 1968, the taxpayer treated deferred and uncollected premiums in a manner consistent with that employed on its N.A.I.C. annual statements. That is, it treated these items as follows:

(a) The taxpayer included in its "gain or loss from operations" under Sections 809(b) and (c) the gross amount of its deferred and uncollected premiums, but deducted therefrom the loading portion of such premiums.

(b) The taxpayer included in its "assets" under Section 805(b)(4) the net valuation portion of its deferred and uncollected premiums, but not the loading portion.

(c) The taxpayer included in its "life insurance reserves" under Section 801(b) the net valuation portion of its deferred and uncollected premiums, but not the loading portion.

In reviewing the taxpayer's returns for each of the above years, the Commissioner challenged the taxpayer's failure to include the loading portion of its deferred and uncollected premiums in its gain or loss from operations and in its assets. He ruled (a) that the loading on deferred and uncollected premiums had to be included in the taxpayer's gain or loss from operations under Sections 809(b) and (c), and (b) that the loading on deferred and uncollected premiums had to be included in the taxpayer's assets under Section 805(b)(4).

The taxpayer paid the additional tax and interest stemming from these determinations and filed claims for refund challenging both of the Commissioner's rulings. These claims were denied. In Count VII of its initial complaint in the instant action the taxpayer abandoned its claim that the loading on deferred and uncollected premiums was not includible in its assets under Section 805(b)(4), but pressed its challenge to the Commissioner's inclusion of the loading portion of deferred and uncollected premiums in the taxpayer's gain or loss from

operations under Sections 809(b) and (c). In its answer to the initial complaint the Government raised as a counterclaim an offsetting adjustment with respect to the taxpayer's deferred and uncollected premiums, pursuant to Treasury Regulation 1.801–4(f). Subsequently, on the eve of trial, the taxpayer amended its complaint, deleting Count VII. The Government has since filed its answer to the amended complaint, restating its counterclaim for an offsetting adjustment.

## DISCUSSION

The issue presented by the counterclaim is whether the Government is entitled to an offsetting adjustment against the taxpayer's recovery in this action pursuant to Treasury Regulation 1.801–4(f).

Regulation 1.801–4(f) provides:

*Adjustments to life insurance reserves.* In the event it is determined on the basis of the facts of a particular case that premiums deferred and uncollected and premiums due and unpaid are not properly accruable for the taxable year under section 809 and, accordingly, are not properly includible under assets (as defined in section 805(b)(4)) for the taxable year, appropriate reduction shall be made in the life insurance reserves. This reduction shall be made when the insurance company has calculated life insurance reserves on the assumption that the premiums on all policies are paid annually or that all premiums due on or prior to the date of the annual statement have been paid.

The Government argues—contrary both to the taxpayer's initial treatment of deferred and uncollected premiums on its returns and to the Commissioner's determinations regarding that treatment—that this Regulation requires that the taxpayer's returns for the years in question must be recomputed to exclude deferred and uncollected premiums from its gain or loss from operations under Sections 809(b) and (c) and from its assets under Section 805(b)(4), and that an appropriate reduction must be made in its life insurance reserves under Section 801(b).

The effect of these recomputations would be to increase the portion of the taxpayer's investment yield taxable to it as computed in the Phase I stage of computing the taxpayer's total federal income tax liability. *See Introduction: The Taxing Formula, supra.* The Court finds, however, that Regulation 1.801–4(f) does not apply to the instant case.[39]

The threshold test of the applicability of Regulation 1.801–4(f) in this case is whether "premiums deferred and uncollected . . . are not properly accruable [in gain or loss from operations] for the taxable year under section 809." The Government concedes that if this condition is not met, the Regulation does not apply and the counterclaim must fail. Sections 809(b) and (c) provide, in pertinent part:

(b) *Gain and loss from operations.—*

 (1) *Gain from operations defined.—* For purposes of this part, the term "gain from operations" means the amount by which the sum of the following exceeds the deductions provided by subsection (d):

 \* \* \* \* \* \*

 (C) the sum of the items referred to in subsection (c).

 \* \* \* \* \* \*

(c) *Gross amount.—*For the purposes of subsections (b)(1) and (2), the following items shall be taken into account:

 (1) *Premiums.—*The gross amount of premiums and other consideration . . . on insurance and annuity contracts . . . ..

Treasury Regulation 1.809–4 provides that, as used in Section 809(c)(1), the "gross amount of premiums" includes, 26 CFR § 1.809–4(a)(1)(i) (emphasis supplied),

[t]he gross amount of all premiums . . . [including] the premiums and other consideration provided in the insurance . . . contract. Thus, the amount to be taken into account [pursuant to Section 809(c)] shall be the total of the pre-

miums and other consideration provided in the insurance . . . contract . . . .. *Such term includes advance premiums, premiums deferred and uncollected and premiums due and unpaid,* . . . ..

Regulation 1.809–4 thus required that the taxpayer's deferred and uncollected premiums be included in its gain or loss from operations under Sections 809(b) and (c).

The Courts of Appeals are divided on the question whether, under facts similar to those presented by the instant case, this Regulation validly compels a life insurance company to accrue and include deferred and uncollected premiums in its gain from operations. Four Circuits—the Fourth, Fifth, Sixth, and Seventh—have held that a life insurance company must so treat deferred and uncollected premiums. *Jefferson Standard Life Insurance Co. v. United States, supra,* 408 F.2d at 854–56; *Western National Life Insurance Co. of Texas v. Commissioner of Internal Revenue,* 432 F.2d 298 (5th Cir. 1970); *Western & Southern Life Insurance Co. v. Commissioner of Internal Revenue,* 460 F.2d 8 (6th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972); *Franklin Life Insurance Co. v. United States, supra,* 399 F.2d at 760–61. Only one Circuit—the Tenth—has taken the view that deferred and uncollected premiums need not be included in a life insurance company's gain from operations. *Standard Life & Accident Insurance Co. v. Commissioner of Internal Revenue,* 525 F.2d 786 (10th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3720 (June 4, 1976). In addition, the Tax Court has reluctantly acquiesced in the majority view, *Bankers Union Life Insurance Co. v. Commissioner, supra,* 62 T.C. at 672–76; and another District Court in this Circuit has concurred in the majority view. *United Life & Accident Insurance Co. v. United States,* 329 F.Supp. 765, 771–72 (D.N.H.1971).

In each of these cases, Regulation 1.809–4 came before the court in a different legal

---

**39.** Because the Court finds that the Government cannot prevail on the merits of the counterclaim, it is unnecessary to reach arguments advanced by the taxpayer that the counterclaim is not properly before the Court.

posture than that presented by the instant case: in the cases cited, the Government was arguing in support of the Regulation and the taxpayer was resisting it. The factual setting was in each case the same, however: the taxpayer had no right to receive the deferred and uncollected premiums until after the close of the taxable year at issue, and the taxpayer computed its reserves on the assumptions that premiums were paid annually in advance and that the average policy anniversary date was July 1.

This Court accepts the majority view that deferred and uncollected premiums must be accrued and included in the taxpayer's gain from operations. The Court concurs with the views expressed by Judge Bownes in *United Life & Accident Insurance Co. v. United States, supra,* that "[t]he clear intent of [Section 809(c)(1)] is to impose a tax on all premiums accruing within the [current policy] year," *id.* at 771, and that the drafters of the 1959 Act intended to adopt the treatment of deferred and uncollected premiums established for the N.A.I.C. annual statement. *Id.* at 771–72. On the latter point, Judge Bownes stated, *idem*:

> [T]he N.A.I.C. accounting procedures require the inclusion of deferred and uncollected premiums for the summary of operations statement. On a strict accrual basis, one could argue that since the company has no legal right to collect deferred and uncollected premiums, they should not be included in tax returns or financial statements for any purpose. The N.A.I.C. has rejected this approach as does the Life Insurance Tax Act. As noted previously, the uncontroverted testimony of the government's expert was that 85% to 95% of deferred and uncollected premiums are ultimately paid. The accrual and recognition of these premiums, therefore, clearly reflect the financial status of the company.

Since the deferred and uncollected premiums were properly accrued and included in the taxpayer's gain from operations, as required by Sections 809(b) and (c) and Regulation 1.809–4, it follows without question that Regulation 1.801–4(f) does not apply in the instant case.

The Court holds that the Government is not entitled to an offsetting adjustment against the taxpayer's recovery in this action pursuant to Regulation 1.801–4(f).

## VI. CONCLUSION

The parties have stipulated that the exact refund, if any, due the taxpayer as the result of this action, together with interest according to law, will be ascertained within 90 days after the Court files its opinion, on the basis of a recomputation by the Internal Revenue Service, agreed to by both parties, and that in the event the parties fail to agree upon the amount of the refund, the parties will so advise the Court and submit the matter to the Court for further decision.

IT IS SO ORDERED.

## APPENDIX

Maine Standard Valuation Law, Maine Revised Statutes Annotated (1965), Title 24, Chapter 15, Subchapter IV (24 Me.Rev.Stat. Ann.): *

### § 2051. Short title

Sections 2051 to 2057 shall be known as the "Standard Valuation Law".

### § 2052. Calculation of reserve liabilities

The commissioner shall annually value, or cause to be valued, the reserved liabilities, hereinafter called reserves, for all outstanding life insurance policies and annuity and pure endowment contracts of every life insurance company doing business in this State . . . and may certify the amount of any such reserves, specifying the mortality table or tables, rate or rates of interest and methods, net level premium method or other, used in the calculation of

---

* Effective January 1, 1970, Title 24, Me.Rev.Stat. Ann. (1965), was repealed and replaced by a new Title 24–A, Me.Rev.Stat.Ann. (1974). [1969] Me.Laws ch. 132, § 1. The new Standard Valuation Law is codified at 24–A Me. Rev.Stat.Ann. §§ 951–957 (1974). The returns at issue in this action must of course be evaluated with reference to the prior law.

such reserves. In calculating such reserves, he may use group methods and approximate averages for fractions of a year or otherwise. In lieu of the valuation of the reserves required of any foreign or alien company, he may accept any valuation made, or caused to be made, by the insurance supervisory official of any state or other jurisdiction when such valuation complies with the minimum standard herein provided and if the official of such state or jurisdiction accepts as sufficient and valid for all legal purposes the certificate of valuation of the commissioner when such certificate states the valuation to have been made in a specified manner according to which the aggregate reserves would be at least as large as if they had been computed in the manner prescribed by the law of that state or jurisdiction.

### § 2053. Minimum standards

The minimum standard for the valuation of all such policies and contracts issued prior to [January 1, 1948] shall be that provided by the laws in effect immediately prior to such date. The minimum standard for the valuation of all such policies and contracts issued on or after [that date] shall be the commissioners reserve valuation method defined in section 2054, 3½% interest, and the following tables:

*1. Standard Ordinary Mortality Table.* For all ordinary policies of life insurance issued on the standard basis, excluding any disability and accidental death benefits in such policies,—the Commissioners 1941 Standard Ordinary Mortality Table for such policies issued prior to [January 1, 1966] and the Commissioners 1958 Standard Ordinary Mortality Table for such policies issued on or after such operative date; provided that for any category of such policies issued on female risks all modified net premiums and present values referred to in sections 2051 to 2057 may be calculated according to an age not more than 3 years younger than the actual age of the insured.

*2. Standard Industrial Mortality Table.* For all Industrial life insurance policies issued on the standard basis, excluding any disability and accidental death benefits in such policies,—the 1941 Standard Industrial Mortality Table for such policies issued prior to the operative date of section 2006, subsection 3 of the Standard Nonforfeiture Law, as amended, and the Commissioners 1961 Standard Industrial Mortality Table for such policies issued on or after such operative date.

*3. Standard Annuity Mortality Table or Annuity Mortality Table.* For individual annuity and pure endowment contracts, excluding any disability and accidental death benefits in such policies—the 1937 Standard Annuity Mortality Table or, at the option of the company, the Annuity Mortality Table for 1949, Ultimate, or any modification of either of these tables approved by the commissioner.

*4. Group Annuity Mortality Table.* For group annuity and pure endowment contracts, excluding any disability and accidental death benefits in such policies—the Group Annuity Mortality Table for 1951, any modification of such table approved by the commissioner, or, at the option of the company, any of the tables or modifications of tables specified for individual annuity and pure endowment contracts.

*5. Class (3) Disability Table.* For total and permanent disability benefits in or supplementary to ordinary policies or contracts—for policies or contracts issued on or after January 1, 1966, the tables of Period 2 disablement rates and the 1930 to 1950 termination rates of the 1952 Disability Study of the Society of Actuaries, with due regard to the type of benefit; for policies or contracts issued on or after January 1, 1961 and prior to January 1, 1966, either such tables or, at the option of the company, the Class (3) Disability Table (1926); and for policies issued prior to January 1, 1961, the Class (3) Disability Table (1926). Any such table shall, for active lives, be combined with a mortality table permitted for calculating the reserves for life insurance policies.

*6. Inter-Company Double Indemnity Mortality Table.* For accidental death benefits in or supplementary to policies—for

policies issued on or after January 1, 1966, the 1959 Accidental Death Benefits Table; for policies issued on or after January 1, 1961 and prior to January 1, 1966, either such table or, at the option of the company, the Inter-Company Double Indemnity Mortality Table; and for policies issued prior to January 1, 1961, the Inter-Company Double Indemnity Mortality Table. Either table shall be combined with a mortality table permitted for calculating the reserves for life insurance policies.

7. *Group Life Insurance Tables.* For group life insurance, life insurance issued on the substandard basis and other special benefits—such table as may be approved by the commissioner.

### § 2054. Commissioner's reserve valuation method defined

Reserves according to the commissioners reserve valuation method, for the life insurance and endowment benefits of policies providing for a uniform amount of insurance and requiring the payment of uniform premiums shall be the excess, if any, of the present value, at the date of valuation, of such future guaranteed benefits provided for by such policies, over the then present value of any future modified net premiums therefor. The modified net premiums for any such policy shall be such uniform percentage of the respective contract premiums for such benefits that the present value, at the date of issue of the policy, of all such modified net premiums shall be equal to the sum of the then present value of such benefits provided for by the policy and the excess of 1 over 2, as follows:

1. *Net level annual premium.* A net level annual premium equal to the present value, at the date of issue, of such benefits provided for after the first policy year, divided by the present value, at the date of issue, of an annuity of one per year payable on the first and each subsequent anniversary of such policy on which a premium falls due. Such net level annual premium shall not exceed the net level annual premium on the 19-year premium whole life plan for insurance of the same amount at an age one

year higher than the age at issue of such policy.

2. *Net-one year term premium.* A net one-year term premium for such benefits provided for in the first policy year.

Reserves according to the commissioner's reserve valuation method for:

A. Life insurance policies providing for a varying amount of insurance or requiring the payment of varying premiums,

B. Annuity and pure endowment contracts,

C. Disability and accidental death benefits in all policies and contracts, and

D. All other benefits, except life insurance and endowment benefits in life insurance policies,

shall be calculated by a method consistent with the principles of the preceding paragraph, except that any extra premiums charged because of impairments or special hazards shall be disregarded in the determination of modified net premiums.

### § 2055. Amount of aggregate reserves

In no event shall a company's aggregate reserves for all life insurance policies, excluding disability and accidental death benefits, issued on or after the operative date of the Standard Nonforfeiture Law, be less than the aggregate reserves calculated in accordance with the method set forth in section 2054 and the mortality table or tables and rate or rates of interest used in calculating nonforfeiture benefits for such policies.

### § 2056. Calculation of reserves

Reserves for all policies and contracts issued prior to [January 1, 1948] may be calculated, at the option of the company, according to any standards which produce greater aggregate reserves for all such policies and contracts than the minimum reserves required by the laws in effect immediately prior to such date.

Reserves for any category of policies, contracts or benefits as established by the commissioner, issued on or after [January 1, 1948], may be calculated, at the option of

the company, according to any standards which produce greater aggregate reserves for such category than those calculated according to the minimum standard provided, but the rate or rates of interest used shall not be higher than the corresponding rate or rates of interest used in calculating any nonforfeiture benefits provided for therein. Reserves for participating life insurance policies issued on or after [January 1, 1948] may, with the consent of the commissioner, be calculated according to a rate of interest lower than the rate of interest used in calculating the nonforfeiture benefits in such policies, with the further proviso that if such lower rate differs from the rate used in the calculation of the nonforfeiture benefits by more than ½% the company issuing such policies shall file with the commissioner a plan providing for such equitable increases, if any, in the cash surrender values and nonforfeiture benefits in such policies as the commissioner shall approve.

Any such company which at any time shall have adopted any standard of valuation producing greater aggregate reserves than those calculated according to the minimum standard herein provided may, with the approval of the commissioner, adopt any lower standard of valuation, but not lower than the minimum herein provided.

### § 2057. Deficiency reserve

If the gross premium charged by any life insurance company on any policy or contract issued on or after [January 1, 1948] is less than the net premium for the policy or contract according to the mortality table, rate of interest and method used in calculating the reserve thereon, there shall be maintained on such policy or contract a deficiency reserve in addition to all other reserves required by law. For each such policy or contract the deficiency reserve shall be the present value, according to such standard, of an annuity of the difference between such net premium and the premium charged for such policy or contract, running for the remainder of the premium-paying period.